**William Gibbs HYMAN, Petitioner,**

v.

**James AIKEN, Warden, CCI, and Travis Medlock, Attorney General, State of South Carolina, Respondents.**

**Civ. A. No. 84–1763–1J.**

United States District Court,
D. South Carolina,
Charleston Division.

March 31, 1985.

Coming B. Gibbs, Jr., Charleston, S.C., for petitioner.

Donald J. Zelenka, Chief Deputy Atty. Gen., State of S.C., Columbia, S.C., for respondents.

## ORDER

HAWKINS, District Judge.

Petitioner William Gibbs Hyman was found guilty of murder and armed robbery by a jury. In a separate proceeding he was sentenced to death. Hyman now petitions this court for habeas corpus relief, 28 U.S.C. § 2254. The case was referred to United States Magistrate Robert S. Carr pursuant to 28 U.S.C. § 636(b)(1)(B) and the local rules of this court. Magistrate Carr recommends that this court enter its order denying the respondents' motion for summary judgment and granting the writ of habeas corpus unless the State of South Carolina grants Hyman a new trial within a reasonable period of time. His recommendation is based, in part, upon the finding that the trial judge's jury charge of a presumption of malice unconstitutionally established a mandatory or burden-shifting presumption which conflicted with the petitioner's presumption of innocence. He also found the same portion of the charge unconstitutionally confusing. In addition, he concluded that the trial court unconstitutionally precluded the jury from considering nonstatutory mitigating circumstances. Finally, Magistrate Carr found Hyman's trial counsel ineffective in several particulars, but he also found that, absent these errors, there was not a reasonable probability that the outcome of the trial would have been different.

The respondents and Hyman filed exceptions to Magistrate Carr's report. After carefully considering all the exceptions, this court is of the opinion that a writ of habeas corpus should *not* be granted. This court is also of the opinion that the respondents' motion for summary judgment should be granted.

## PROCEDURAL HISTORY

After a four day trial, Hyman was convicted of murder and armed robbery on October 11, 1979. The next day, the jury

recommended the death sentence in a separate proceeding conducted in accordance with S.C.CODE ANN. § 16–3–20–26 (cum. supp. 1984).[1] The conviction and sentence were upheld on direct appeal to the South Carolina Supreme Court in *State v. Hyman,* 276 S.C. 559, 281 S.E.2d 209 (1981), *cert. denied,* 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982), *reh. denied,* 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403 (1982).

On July 7, 1982, Hyman filed his first application for post-conviction relief. S.C. CODE ANN. § 17–27–10 *et seq.* (Law.Co-op.1976). South Carolina State Circuit Court Judge James M. Morris held an extensive evidentiary hearing, the transcript of proceedings covers nearly 1700 pages. On March 8, 1983, Judge Morris dismissed Hyman's application in a thorough 45-page order. Following this, Hyman petitioned the State Supreme Court for a writ of certiorari. This, too, was denied. A second application for post-conviction relief was filed on July 11, 1984. This application was also denied by the South Carolina Supreme Court on July 25, 1984.

On July 26, 1984, Hyman filed this application for habeas corpus relief, asserting a plethora of grounds. On August 9, 1984, the respondents filed their return to the petitioner's application and moved for summary judgment.[2]

BACKGROUND

On Saturday night, March 24, 1979, William Gibbs Hyman, his wife, Doris, Sue Allday, Robert Hinson and Iris Midgett arrived at the Winchester Club, a bar and lounge in North Charleston, South Carolina. After seating themselves at a booth, the group ordered a round of drinks. At some point, the conversation turned to "shortage of money." [Tr. 41]. According to Sue Allday, "Gibbs said something about let's go out to Ravenel and get Iris's [sic] boys." [3] [Tr. 41]. "Iris' boys" were Teagus and Collins Griffis. They were two elderly men who lived in a mobile home or trailer in Ravenel, South Carolina. They were called "Iris' boys" because Iris Midgett and another woman, Mary Taylor, previously robbed them of $1,690. Hoping that the men would again have a large amount of cash on hand, the group decided to rob them by either deception or violence.

After procuring a 20-gauge double-barreled shotgun and a bag full of shotgun shells, the group proceeded to Ravenel in Hyman's car. Sue Allday was given the responsibility of driving because she was considered to be more sober than anyone else in the party. After arriving at the Griffis home and parking the car, Gibbs Hyman, Doris Hyman, Sue Allday and Robert Hinson approached the trailer.[4] Iris Midgett remained in the car.[5] To avoid being seen by the occupants, Hinson and the petitioner took positions against the wall of the trailer on either side of the trailer door. Sue Allday and Doris Hyman knocked on the door. Someone inside the trailer asked for their identity. The women gave fictitious names and stated that they were experiencing car trouble. Collins Griffis opened the door. A short conversation followed; Mr. Griffis then invited the ladies inside the trailer to have a drink. Doris Hyman refused. Griffis, apparently angry over the refusal, went back inside the trailer, shut the door, and the women returned to the car.

---

1. Hyman's case was prosecuted under the current law which is patterned after the Georgia statute upheld in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

2. Hyman admits that, except for one particular, the record before the court is sufficient and complete and that there is no need for additional evidentiary hearings. To remedy this defect, the magistrate examined records that the state post-conviction judge refused to consider. He found them of no value in assessing Hyman's claim.

3. This testimony was corroborated by Robert Hinson [Tr. 177] and Iris Midgett [Tr. 218–19].

4. On the first approach to the trailer, the loaded 20–guage shotgun was carried by Gibbs Hyman.

5. It was agreed by all that she should remain in the car. If the Griffis brothers recognized her because of the earlier robbery, the present scheme might be thwarted.

Hinson and the petitioner followed them. Hyman and his wife had a heated exchange of words because she had angered their victims. At this point, it was suggested that the robbery be aborted. Hyman said "he wasn't going no where without the money." [Tr. 60].

Thereafter, the petitioner, Sue Allday[6] and Robert Hinson went back to the trailer door. While Allday knocked on the door, Hinson and Hyman "crouched down right beside the steps." [Tr. 62]. Someone inside the trailer asked them to leave, "and he inferred that he knew that [they] were there for a robbery." [Tr. 63]. The party did not retreat even though the occupant threatened to shoot them. Suddenly the door swung open and one of the Griffis brothers shot Robert Hinson in the leg. Allday, from the ground, fired a shot up inside the trailer. A melle ensued. Collins Griffis was struck in the head several times with the butt and barrel of a shotgun. Blood was splattered throughout the trailer. Teagus Griffis was shot twice.[7] One shot, fired from a distance of greater than two to three feet, entered his chest at a downward angle. The wound it inflicted was about the size of a quarter. As a result of this shot, "the main part of the right side of the heart was destroyed...." [Tr. 264]. The second shot, fired at an upward angle, caused "a grazed wound" [Tr. 265] to the right shoulder. Teagus Griffis died immediately. The shotgun owned by the Griffis' was taken from the trailer. After assisting the wounded Hinson to the car, the party drove back to Charleston and dropped him off at a local hospital.

About a week later, Hyman, as well as all the other participants, were arrested and charged with murder and armed robbery. Hyman's family, through his brother, retained D.J. Stratos, Esq. of the Charleston County Bar to represent the petitioner and his wife. Doris Hyman subsequently obtained other counsel.

At the May 1979 term of the Court of General Sessions for Charleston County, Gibbs Hyman, Doris Hyman, Iris Midgett, Robert Hinson and Sue Allday were indicted for the shotgun murder of Teagus Griffis. They were also indicted for armed robbery because they allegedly took the victims' shotgun.

Pursuant to a plea agreement with the Charleston County Solicitor, Robert Hinson pled guilty to common law murder on July 20, 1979. He received a life sentence. Under a similar agreement, Sue Allday pled guilty to common law murder and received a life sentence. Iris Midgett pled guilty to accessory before the fact of armed robbery. She was sentenced to serve 18 years in prison. Until the eve of trial, the solicitor offered Gibbs Hyman the same plea agreement that was offered to Hinson and Allday. Despite numerous recommendations by his attorneys that he accept the plea, Hyman was adamant that he did not kill Teagus Griffis and that he was "going forward with the trial." [Tr. 6].[8]

Sometime between July 6 and July 9, 1979, the solicitor notified Hyman of his intent to seek the death penalty in accordance with S.C.CODE ANN. § 16–3–26(A) (cum. supp. 1984). On July 9, 1979, Clyde A. Eltzroth, Presiding Judge, Ninth Judicial Circuit, denied petitioner's motion to relieve Mr. Stratos as counsel. Because the death penalty was being sought, Judge Eltzroth, pursuant to S.C.CODE ANN. § 16–3–26(B) (cum. supp. 1984), instructed the Clerk of Court to appoint an additional attorney. Landon Louthian, Esq., also of the Charleston County Bar, was appointed as Hyman's second attorney on July 24, 1979.

---

6. On the second trip to the trailer door, Sue Allday carried the loaded 20-gauge shotgun.

7. Allday testified that Hyman grabbed the gun from her when she was unable to shoot the man who shot Hinson.

8. Doris Hyman was offered a plea agreement similar to that offered to Hinson, Allday and the petitioner. She, like Hyman, refused to plead. After Hyman was convicted and sentenced to death, the state brought her to trial.

As mentioned above, the solicitor continued to offer a plea bargain whereby the state would abandon its request for the death penalty in return for a guilty plea to murder. Mrs. Stratos and Mr. Louthian met separately and together with Hyman and advised him that the evidence against him was overwhelming. Therefore, they strongly recommended that it would be in his best interest to plead guilty and accept a life sentence. On October 8, 1979, the case proceeded to trial. Hyman was convicted of murder and armed robbery. Following a mitigation trial, the jury recommended the sentence of death on October 12, 1979.

## I. THE JURY CHARGE

### A. *Presumption of Malice*

Hyman's claim for habeas relief is that the trial court's jury charge on a presumption of malice created either a mandatory presumption or a burden-shifting presumption. As such, the petitioner claims that the charge deprived him of due process of law in violation of the fourteenth amendment to the United States Constitution.

Magistrate Carr agreed with him. At pages 36–46 of his report, he set forth his reasoning and then reached the following conclusion of law

> The trial court's charge of a presumption of malice unconstitutionally established a conclusive presumption which conflicted with the presumption of innocence, shifted the burden of persuasion to the petitioner on the element of malice, and was unconstitutionally confusing. [Mag.Rep. 59].

The respondents object to this conclusion and the reasoning upon which it is based.

When reviewing jury instructions, a court must keep in mind that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). To state this proposition another way, "[r]eviewing courts must resist the temptation to read jury instructions myopically."

*Briley v. Bass*, 750 F.2d 1238, 1243 (4th Cir.1984).

In collateral proceedings, the Supreme Court has made it clear that the "burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). A petitioner requesting habeas corpus relief must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400. "Before a federal court may overturn a conviction resulting from a state trial ... it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Id.* at 146, 94 S.Ct. at 400. It is also important to note that "it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1736; *Briley v. Bass*, 750 F.2d at 1243. *See also, United States v. McCaskill*, 676 F.2d 995, 999, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982).

As stated in *Henderson*, the state's power is not unlimited. The due process clause of the fourteenth amendment of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *accord, Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

Murder is defined by S.C.CODE ANN. § 16–3–10 (Law.Co-op.1976) as "the killing of any person with malice aforethought, either express or implied."

While malice is a necessary ingredient of murder, it is not relevant until and unless it be found that the accused person did in fact wrongfully kill the victim.... When one is found to have wrongfully taken the life of another, the element of malice becomes important in determining the degree of unlawfulness. If the unlawful killing is without malice, the offense is reduced to manslaughter under § 16–3–50. If the unlawful killing is through criminal negligence, the offense is involuntary manslaughter under § 16–3–60. If the killing is in self-defense, there is no crime.

*State v. Gaskins*, 326 S.E.2d 132 (1985).

The jury charge complained of in this instance reads:

Now, I'll deal first with the offense charging count one of the Indictment, murder; and then after that, deal with the second count charge of armed robbery. Murder as you have been advised is the killing of any person with malice aforethought; that's either expressed malice or implied malice. So in order to convict a person of the offense of murder, the State must not only prove the killing of the deceased by the Defendant, but that it was done with malice aforethought. And this proof must be beyond a reasonable doubt. Malice in the definition of murder is a technical term. Malice imposes wickedness. Malice excludes any just cause or excuse for the act. Malice is something which springs from wickedness, from depravity, from a depraved spirit, a heart which is devoid of social duty, one fatally bent on mischief. Malice in the definition of the offense of murder which I've explained to you, is the killing of any person with malice aforethought, either expressed or implied malice. Malice may be expressed or it may be implied. These words, expressed or implied, don't mean different kinds of malice, but the manner in which malice may be shown to exist; that is, malice may be shown either by direct evidence or by circumstantial evidence or inference. Malice may be expressed; for example, where you have previous threats of vengeance or where there is a lying in wait or where the circumstances show directly that an intent to kill was entertained. It may be implied; for example, where there's no expressed intent to kill proven by the direct evidence, it is indirectly and necessarily inferred from the facts and the circumstances which were in fact proven. And malice is implied, it's presumed from the willful, the deliberate, the intentional doing of an unlawful act without just cause or excuse. So, generally speaking, malice means the doing of a wrongful act, intentionally and without any justification or excuse. Now, even if all the facts has [sic] proven and is sufficient to raise a presumption of malice, this presumption would be rebuttable and it's for you on the Jury to determine from all of the evidence whether or not malice has been proven beyond a reasonable doubt. Malice is presumed or implied from the use of a deadly weapon. Where the circumstances relating to the death of the deceased are brought out in the evidence, the presumption of malice which is implied from the use of tha [sic] deadly weapon vanishes and the burden is on the State to prove malice whenever a deadly weapon is used by evidence which satisfies you on the Jury beyond a reasonable doubt. To convict a person of murder, the malice must be aforethought. And it must be present, aforethought. The law doesn't require that malice shall exist for any particular length of time before the act is committed; but it must be aforethought. It must be the accommodation of the previous evil intent and of the act which produces the fatal result. And it must be proven beyond a reasonable doubt. The State is not required to prove any motive for the killing. So that is the law with regard to the offense of murder which is the killing of any person, with malice aforethought, either expressed malice or implied malice." [9] [Tr. 417–420]. (Emphasis added).

9. Because *Cupp* mandates review in light of the entire charge, the full text of the trial judge's

■ The upshot of the respondents' objection is that the magistrate improperly *characterized* the above underlined language as creating a mandatory or burden-shifting presumption. The court agrees with the respondents. Neither portion of the disputed malice charge creates a mandatory or burden-shifting presumption. Several principles must be kept in mind when a court characterizes the type of presumption present in a jury charge.

First,

[I]nferences and presumptions are a staple of our adversary system of fact finding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an "ultimate" or "elemental" fact—from the existence of one or more "evidentiary" or "basic" facts. The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on the evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt.

*County Court of Ulster County v. Allen,* 442 U.S. 140, 156, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979) (citations omitted). (Emphasis added).

Second, the court must first correctly determine the type of presumption presented in the jury charge in order to apply the correct constitutional analysis.

The threshold inquiry in ascertaining the constitutional analysis applicable to kind of jury instruction is to determine the nature of the presumption it describes.

That determination requires careful attention to the words actually spoken [10] to the jury, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.

*Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979) (citations omitted).

Third, presumptions are divided into two (2) categories, mandatory and permissive. At the very least, mandatory presumptions shift the burden of production of some evidence to the defendant; "it tells the trier [of fact] that he or they *must* find the elemental fact upon proof of the basic fact at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." *County Court of Ulster County v. Allen,* 442 U.S. at 157, 99 S.Ct. at 2224. (Emphasis in original).

This class of more or less mandatory presumptions can be subdivided into two parts: presumptions that merely shift the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution; and presumptions that entirely shift the burden of proof to the defendant.

*Id.* at 157, n. 16, 99 S.Ct. at 2225, n. 16. A permissive presumption is one which allows, but does not require, the trier of fact to infer the presumed fact from proof of the basic facts.

The nature of the presumption also determines the applicable test of constitutional validity.

Because [the] permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt standard' only if, under the facts of the

---

instructions is set forth in Appendix A to this opinion.

**10.** The "words actually spoken" are important. However, they are only "generally ... control-

ling" [and] their interpretation may require recourse to the statutes involved and the cases under it. *County Court of Ulster County v. Allen,* 442 U.S. at 157, n. 16, 99 S.Ct. at 2225, n. 16.

case, there is no rational way the trier could make the connection permitted by the inference.

*Id.* at 157, 99 S.Ct. at 2224.

On the other hand, a mandatory presumption is analyzed on its face to determine the extent to which basic and elemental facts coincide.

> To the extent that the trier of fact is *forced* to abide by the presumption, and may not reject it based on an independent evaluation of the particular facts presented by the State, the analysis of the presumption's constitutional validity is logically divorced from those facts and based on the presumption's accuracy in the run of cases.

*Id.* at 159, 99 S.Ct. at 2226.

Concededly, the jury charge contains two passages which must be construed to determine the nature of the presumption created. The first passage, containing four sentences, reads:

> [Malice] may be implied; for example, when there's no expressed intent to kill proven by the direct evidence, it is indirectly and necessarily inferred from the facts and circumstances which were in fact proven. And malice is implied, it's presumed from the willful, the deliberate, the intentional doing of an unlawful act without just cause or excuse. So generally speaking, malice means the doing of a wrongful act, intentionally and without any justification or excuse. Now, even if all the facts has [sic] proven and is sufficient to create a presumption of malice, this presumption would be rebuttable and it's for you the Jury to determine from all the evidence whether

or not malice has been proven beyond a reasonable doubt. [Tr. 418].

This passage of the charge created a mere *permissive* presumption. The first sentence made it clear that malice *"may"* be implied or *"inferred"* from the facts and circumstances proved by the state. The second sentence clarified and restated the first sentence, "it defined implied malice." *Collins v. Francis,* 728 F.2d 1322, 1330 (1984); *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). This sentence reflects "substantially the famous definition of malice by Bayley, J., in *Bromage v. Proser,* 10 E.C.L. 321: 'Malice, in common acceptation, means ill will against a person but in its legal sense it means a wrongful act done intentionally without just cause or excuse.'" *State v. McDaniel,* 68 S.C. 304, 312, 47 S.E. 384, 387 (1904).[11] The petitioner would have a much stronger position if the second sentence read, "and malice *must* be implied, it *must* be presumed," or "malice *shall* be presumed, it *shall* be implied." Given the language used, "malice is implied, it's presumed ...," and its context in the charge, the jury was left free to credit or reject the inference suggested by the court.

The third sentence made it clear that the jury was under no *mandate* to find that malice existed. The trial judge restated what he had said seconds before and qualified the statement with the words "generally speaking." There was not a hint of a suggestion that the jury's fact finding duty was being curtailed or that it had to find that Hyman had acted with malice. The fourth sentence began with three (3) crit-

---

**11.** The "intentional act" referred to in this charge is the "intentional killing" of another person without just cause or excuse.

There can be no doubt, under the decisions in this state that malice is presumed from an intentional killing, in the absence of facts and circumstances in evidence to show want of malice.... An intentional homicide, without any excuse is certainly murder. The language "without any justification or excuse" not only excludes justifiable and excusable homicide, but homicide extenuated to manslaughter because done in sudden heat and passion upon

sufficient legal provocation. It must not be supposed that the word "excuse" is only applicable to excusable homicide as homicide in self defense.... It would therefore be wrong to hold that the "excuse" was intended by the court ... to be used in the absence of something which renders one wholly excusable or justifiable, but, on the contrary it should be held to include also any legal extenuation of the offense charged.

*State v. McDaniel,* 68 S.C. at 312–13, 47 S.E. at 387.

ical words: "Now even if. . . ." By the use of these words, a reasonable juror would have understood that he was entirely free to draw or reject the inference suggested by the court. Moreover, the jury was not told that the defendant was required to rebut malice if it found it to exist. Instead, the charge only pointed out that it was *possible* to rebut the presumption. Immediately after the word "rebuttable," the judge drew the jury's attention back to its unique province to find malice from "all of the evidence" and then properly allocated the burden of proof on this issue to the state.

Assuming for the sake of argument that a reasonable juror would have understood the fourth sentence to impose a burden of producing evidence, and, thus, the presumption should be characterized as a mandatory one, "it may well be that its impact is no greater than that of a permissive inference, and it may be proper to analyze it as such." *County Court of Ulster County v. Allen*, 442 U.S. at 157, n. 16, 99 S.Ct. at 2225, n. 16.

The case law does not provide a ready analysis for distinguishing such presumptions. In *Sandstrom*, however, the court addressed the constitutionality of the charge, " '[t]he *law presumes* that a person intends the ordinary consequences of his voluntary acts.' " 442 U.S. at 517, 99 S.Ct. at 2455. (Emphasis in original). This instruction was left standing alone with no curative instructions. Justice Brennan noted that the jury was "not told that the presumption could be rebutted . . . by the defendant's simple presentation of 'some' evidence; nor even that it could be rebutted at all." *Id.* at 517, 99 S.Ct. at 2455. While it is true that the charge in Hyman's case does not instruct the jury that the presumption could be rebutted by "some" evidence, this omission was not left standing alone but was surrounded by curative

instructions that no reasonable juror could ignore—the State still had to prove malice, from all the evidence in the case, beyond a reasonable doubt. *See e.g., Corn v. Zant*, 708 F.2d 549 (11th Cir.1983); *Davis v. Zant*, 721 F.2d 1478 (11th Cir.1984). In addition, the words at issue were accompanied by a strong explanation of circumstantial evidence which would tend to indicate, by way of example, the ways in which the state could prove implied malice. Because of these factors, even if the words created some type of a rebuttable presumption, its impact upon the reasonable juror was likely no greater than that of a permissive inference.

The magistrate's report also fails to apprehend the "mechanics" of this charge. Not only is the permissive nature of presumption ignored but also the way in which it operates. Under this charge, the State had to prove beyond a reasonable doubt:

(1) that Teagus Griffis was intentionally killed;

(2) that it had been done by another person, in this case found to be Hyman; and,

(3) that there was no just cause or excuse for the killing.[12]

Once the state proved these three (3) elements, the jury was permitted, not required, to draw or to presume an inference of malice. They were also free to not draw or presume an inference of malice. Had the jury utilized the presumption, then Hyman was free to rebut it or not to rebut it. But he was not required to. Furthermore, the charge does not tell the jury that only the defendant could rebut the presumption. Rather, the jury was left free to even draw from the state's evidence to determine if the presumption had been rebutted.

Finally, the magistrate focused on a single sentence in a charge that otherwise covered 12 pages. In connection with the

---

**12.** As stated by the South Carolina Supreme Court,

There are only four ways in which [Griffis], or any other person, could die: (1) suicide (2) accidental death, (3) natural causes, and (4) at the hands of another. There . . . never [was] any contention throughout the trial of [Hy-

man's] case, on anyone's part, that the killing was suicide, accidental or from natural causes. Patently, [Griffis] died at the hands of another, found to be [Hyman] . . . Here the offense was murder or nothing.
*State v. Gaskins*, 326 S.E.2d 132.

charge on *murder,* the trial court instructed the jury *no less than ten times* that the state had to prove the defendant guilty beyond a reasonable doubt.[13]

The second portion of the disputed charge contains two (2) sentences. The trial judge stated:

> Malice is presumed or implied from the use of a deadly weapon. Were circumstances relating to the death of the deceased are brought into evidence, the presumption of malice which is implied from the use of tha [sic] deadly weapon vanishes and the burden is on the State to prove malice whenever a deadly weapon is used by evidence which satisfies you on the Jury beyond a reasonable doubt. [Tr. 418].

The magistrate found that "a reasonable juror could have interpreted the presumption as shifting to the defendant the burden of producing some evidence of the deceased's death to cause the presumption to vanish. [Mag.Rep. 45]. The court cannot agree with the magistrate. This passage of the charge created *no* presumption, not even a permissive one.

This first sentence of the charge is derived from common law. " 'As a general doctrine, subject, ... to some qualification, the malice of murder is conclusively inferred from the unlawful use of a deadly weapon, resulting in death.' " *State v. Levelle,* 34 S.C. 120, 127, 13 S.E. 319, 320 (1891). When charging this doctrine, judges were apt to give it life by this kind of illustration. "If one were to fire a loaded gun into a crowd, or throw a piece of heavy timber from the top of a house into a street filled with people, the law would infer malice from the wickedness of the act." *State v. Smith,* 2 Strob 77, 80 (1947); *see also, State v. Ferguson,* 2 Hill 619 (1835). This general statement of the law

is usually qualified by the instruction that the presumption "vanishes."

> This presumption is not applicable when the facts and circumstances attending the homicide are disclosed in evidence so as to draw a conclusion of malice or want of malice, as one fact, from the evidence. Presumptions of this class are intended as substitutes in the absence of direct proof, and are in their nature indirect and constructive. The best evidence of the state of mind attending any act is what was said and what was done by the person whose motive is sought for. The motive that impels to the taking of human life is no exception to this rule, and the importance of the consequences that depend on the accurate ascertainment of its nature in such cases, affords the strongest ground for limiting indirect and constructive proof to the narrow grounds within which they belong.

*State v. Hopkins,* 15 S.C. 153, 157 (1880).

The first sentence is absent mandatory language indicating that the jury had to reach a certain result. Instead, it is a definition of malice. There is no reference to the defendant or any duty on his part to produce "some" evidence. If the judge had charged the first sentence without more explanation, Hyman would have a stronger claim. But this did not occur. The charge made it clear that where the circumstances of the victim's death are brought out into evidence, the presumption *"vanishes."* A reasonable juror could only have understood that once the circumstances of the victim's death were in evidence, the state was not entitled to a presumption or inference of any kind. The jury was free to find malice, or the lack of it, based upon what was said or done by Hyman. One would have to construct an argument out of whole cloth to conclude that this portion of the charge worked to Hyman's detri-

---

**13.** In connection with the entire charge, the jury was told of the state's proper burden of proof at least *15* times. Moreover, the charge is peppered with statements like "this Defendant ... is ... clothed with [a] presumption of innocence ..." [Tr. 416], and "the Defendant is entitled to the benefit of any and every reasonable doubt; of [sic] any and every phase of the case." [Tr. 424]. It is simply inconceivable that the jury was left with the impression that its fact-finding duty was being abrogated by a mandatory presumption or that the defendant had a duty, however slight, to prove his innocence as to any element of the crime.

ment.[14] "On the contrary it was as favorable to him as the law allowed." *State v. Alexander*, 30 S.C. 74, 84, 8 S.E. 440, 442 (1889). Moreover, it strains credulity to argue that a reasonable juror could believe that the defendant had a burden to put into evidence circumstances of the victim's death. Such language is plainly not present anywhere in the charge. The first sentence of the charge may have been superfluous. But it cannot be said that a reasonable juror could have thought it placed upon the defendant a burden to produce evidence.

In light of several recent South Carolina cases, one can easily understand the Supreme Court's admonition that federal courts not concern themselves with jury instructions that are only "undesirable, erroneous or even 'universally condemned'...." *Cupp v. Naughten*, 414 U.S. at 146, 94 S.Ct. at 400. The magistrate seemed to be influenced by a line of South Carolina cases which disproved similar malice charges. *See State v. Mattison*, 276 S.C. 235, 277 S.E.2d 598 (1981); *State v. Elmore*, 279 S.C. 417, 308 S.E.2d 781 (1983); *State v. Llewellyn*, 281 S.C. 199, 314 S.E.2d 326 (1984); *State v. Woods*, 282 S.C. 18, 316 S.E.2d 673 (1984).

However, after the magistrate's report was received by this court, the South Carolina Supreme Court, considering charges like the one at issue here, affirmed three convictions despite the prior threats that continued use would constitute "reversible error." *See State v. Gaskins, State v. Singleton*, 326 S.E.2d 153 (1985); *State v. Lucas*, 328 S.E.2d 63 (S.C.1985).

The more recent cases are not mentioned in order to support any conclusions reached by this court. The point is simply made to show the futility of relying upon state decisions when the inquiry is not what language is preferred in a jury charge but rather what is constitutionally permissible. More importantly, when one reads the cases cited in the magistrate's report, it becomes evident that the South Carolina Supreme Court "was primarily concerned with directing inferior courts to refrain ... from giving the instruction because it was thought confusing, of little positive value to the jury or simply undesirable." *Cupp v. Naughten*, 414 U.S. at 145, 94 S.Ct. at 399. The state court was, "in effect, exercising the so-called supervisory powers of an appellate court to review proceedings of trial courts and to reverse judgments of such courts which ... [it] conclude[d] were wrong." *Id.* at 146, 94 S.Ct. at 400. For this reason, these state decisions are of little or no value in a collateral proceeding of this type. The line of cases referred to in the magistrate's report is not helpful in reaching a judgment on Hyman's claim.

■ The magistrate also thought the charge defective because it, as a whole, was so conflicting and confusing as to be constitutionally infirm. *See Thomas v. Leeke*, 725 F.2d 246 (4th Cir.) *cert. denied,* — U.S. ——, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984).

A reasonable juror could have interpreted the charge literally as establishing two different burdens of proof. The first would require [Hyman] to come forward with proof beyond a reasonable doubt of justification or excuse. The second would put on the state the burden of proving beyond a reasonable doubt "malice whenever a deadly weapon is used." Also a reasonable juror could have concluded that the burden is on the State to prove malice *only* when a deadly weapon is used, and not when malice is presumed from an unlawful act. [Mag.Rep.46].

---

**14.** As in most murder cases, the "intentionally killing" is usually accomplished with a "deadly weapon." In essence, they are like hand-in-glove. Because they are so intertwined, the second portion of the charge likely negated the jury's use of the earlier permissive presumption.

The reasonable juror could have understood the charge to remove any presumption, either one implied from any intentional act or one implied from the use of a deadly weapon, that inured to the state once the circumstances of the deceased's death were brought out in evidence. *See e.g., State v. Jones*, 21 S.C. 596, 7 S.E. 296 (1888); *State v. Coleman*, 6 S.C. 185 (1875); *State v. Hopkins*, 15 S.C. 153 (1880).

To adopt this conclusion, this court would have to engage in a tortured reading of the charge. Moreover, the charge at issue here bears no resemblance to the one present in *Thomas*.

In *Thomas*, the defendant was required to shoulder the burden of proof and the burden of persuasion; she had to prove, by a preponderance of the evidence, the four (4) elements of self-defense. The State was required to prove, beyond a reasonable doubt, the elements of murder or manslaughter. The district court rejected Thomas' claims that she was required to disprove an element of murder and denied her petition for habeas corpus. The Fourth Circuit Court of Appeals reversed. It held that the trial court "had in one breath instructed that the accused had the burden of proving self defense by a preponderance of the evidence, yet in the other that the prosecution had to prove beyond a reasonable doubt that the killing had been felonious (and therefore unlawful) and with malice." *Thomas v. Leeke*, 725 F.2d at 250–51. Without determining that the charge unconstitutionally shifted the burden of proof on self defense, the court struck it down because "the instructions regarding the burden of proof were so inherently *contradictory and confusing as to rise to the level of a constitutional infirmity under the principles of Winship, Mullaney, Guthrie and Wynn.*" *Id.* at 252. (Emphasis added).

Hyman's case, however, is completely different. At no time was any burden placed upon him to show justification or excuse to *any* degree. The state solely had the burden of proof on the element of malice. Accordingly, it cannot be said that a reasonable juror could have understood it to establish two different burdens of proof. Also, under either portion of the charge, with or without the use of a permissive or "vanishing" presumption, the burden was always the state's. A reasonable juror could not have understood that the State was required to prove malice *only* when a deadly weapon is used. The charge, read with reason and common sense, makes this crystal clear. For these reasons, the court

rejects the magistrate's recommendation that it should find the charge "conflicting and confusing."

### B. *Harmless Error*

Having found that there is no *Sandstrom* error, there is no need for the court to go further. However, assuming, *arguendo*, that the charge violated *Sandstrom*, the respondents ask the court to consider its harmlessness under *Fulton v. Warden, Maryland Penitentiary*, 744 F.2d 1026 (4th Cir.1984). In *Fulton*, Chief Judge Winter noted that there is no *per se* rule of reversal for *Sandstrom* constitutional violations. He stated that "[i]n cases involving similar errors, we have always assessed the impact of those errors by carefully considering the record as a whole in each instance. *See e.g., Anderson v. Warden, Maryland Penitentiary*, 696 F.2d 296 (4th Cir.1982), and *Guthrie v. Warden, Maryland Penitentiary*, 683 F.2d 820 (4th Cir.1982)." 744 F.2d at 1031–32. The court went on to hold the test for a *Sandstrom* violation is that laid down in *Henderson v. Kibbe*—"whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 154, 97 S.Ct. at 400 (citations omitted); *Morris v. Maryland*, 715 F.2d 106, 108 (4th Cir. 1983). If a reasonable juror could have understood the charge to create a conclusive presumption of malice, then the question is whether the instruction rendered the trial "fundamentally unfair."

■ This court is of the opinion that the evidence of "expressed" malice and Hyman's guilt was overwhelming as to not render his trial fundamentally unfair. Three (3) of Hyman's coperpetrators testified against him. Eye witness Allday told the jury that Hyman hatched the plan to commit the robbery. [Tr. 46]. After she and Hinson and Midgett returned to the nightclub without a shotgun, Hyman rebuked them saying, "That's the main reason I wanted you to go by there and get shotgun shells too, to get the shotgun."

[Tr. 47]. Hyman directed them to "his next door neighbor's apartment and ... Hyman come [sic] out with a shotgun in. his hand. [Tr. 221].[15] When given a chance to abort the robbery, Hyman replied "he wasn't going no where without the money." [Tr. 60]. Hyman instructed Allday to shoot Collins Griffis. She was unable to operate the gun so he grabbed it from her and began beating Griffis. "[S]everal times he chopped him, like you know, across the head with it." [Tr. 68]. Hyman then shot into the ceiling and "started asking for the money.... When the man told him he didn't have any ... he started hitting him again." [Tr. 69–70]. The double barrel shotgun broke, so that petitioner started "beating Collins Griffis with his own gun." [Tr. 70]. After Allday heard a shot, she saw "Gibbs Hyman standing there with a gun in his hand and Teagus Griffis standing over just a little ways from the front of him with his hands up, stumbling, [sic] and fell back on the couch." [Tr. 72]. The petitioner returned to the car with two (2) guns. [Tr. 226]. Hinson was unable to make it back to the car. Hyman "hollored several times ... I'll shoot you and leave you here." [Tr. 74]. The guns were thrown out of the car. On the way back to North Charleston, Hyman "told Iris that he had shot the man in the heart and he was dead and he had killed him." [Tr. 85–6].[16] Hinson, unconscious, was left on the ground at the hospital. Back in North Charleston, the group washed blood out of their clothing at Sue Allday's house. Hyman and his wife dropped Allday off at the Western Social Club; the two of them went to Red Coulston's house to arrange an alibi. Hyman, his wife, Midgett and Allday met at the Kangaroo Club early Sunday morning. There, they discussed their alibi. Realizing that the guns might be found on the side of the road, they drove back to Ravenel. Hyman "started looking for the guns up and down the road and found them." [Tr. 83]. The guns were thrown into the Ashley River, North Charleston.[17]

Hyman did not testify during the guilt phase of the trial. He did, however, testify during the penalty phase. Essentially, he maintained that on March 24th he intended to go to Walterboro, South Carolina, to speak with his brother-in-law. Hyman was upset because his sister had allegedly been beaten up by her husband. He asserted that he was too intoxicated to remember any of the night's incidents. He did not assert that the killing was without malice, or that it was negligent, or that it was in self-defense. Therefore, the only question that could have existed in the jury's mind was whether Hyman, or someone else, fired the fatal shot.

> The corrupting effect of a *Sandstrom* instruction depends upon the nature of the defense, if any, made at the trial. Where a defense of non-participation in the criminal act is urged at trial, the effect of a *Sandstrom* instruction as a factor upon which the verdict was based may diminish particularly where the conduct or nature of the crime as evidenced by the record, firmly negates any reasonable possibility that the perpetrator of the crime, whoever it may have been, lacked the requisite intent.

*Garland v. Maggio*, 717 F.2d 199, 203–4 (1983). Throughout the trial there was never a serious contention by anyone that the perpetrator[s] of the crime lacked the requisite malice. The brutal and disgusting nature of the crime is self-evident. Hyman twice "laid in wait" for the victims. He made several other statements and un-

---

**15.** Hyman disputed the state's evidence that it was he who procured the shotgun. He produced evidence that the double-barreled shotgun was Hinson's and that Hinson placed it in the trunk of the car. [Tr. 319–329].

**16.** Midgett tells of Hyman's confession in this way: "Gibbs looked me in the face and he said I shot him. That the old man had his hands up and he shot him and the old man stiffen [sic] up and the old man fell backward on the couch and I [Hyman] ran over there and ... tore open his shirt to see and I [Hyman] knew he was dead." [Tr. 228].

**17.** Doris Hyman, the petitioner, and Midgett returned to the spot where they disposed of guns. Midgett found the stock of one of the guns and threw it away. [Tr. 232].

dertook action which support an uncontradicted inference of express malice. Hyman's guilt is amply supported by the record. The evidence of malice is overwhelming and requires no more elaboration. Therefore, even if the malice charge violated *Sandstrom,* the court finds that it did not render Hyman's trial "fundamentally unfair."

### C. *Non-Statutory Mitigating Circumstances*

Hyman also seeks a new trial for alleged error in the penalty phase jury instructions. The magistrate found that the "trial judge's instructions could, and undoubtedly would, have been considered by a reasonable juror as limiting their [sic] consideration to the two mitigating circumstances outlined in the charge and written down on the jury instructions." [Mag.Rep. 54–5]. This court is of the opinion that the magistrate misconceived the constitutional requirements of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Supreme Court struck down a North Carolina statute that *required* imposition of the death penalty for first degree murder. In a plurality decision, the Court reasoned that the statute foreclosed the use of the sentencer's discretion in a capital case. This violates the principle that "justice ... requires consideration of ... the circumstances of the offense together with the character and propensities of the offender." *Id.* at 304, 96 S.Ct. at 2991 (*quoting Pennsylvania v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937)).

This principle was given further life in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett,* the Supreme Court struck down the Ohio death penalty statute because it did not permit the sentencer to consider mitigating factors of age or family history. Under the Ohio statute, once a defendant was found guilty of aggravated murder, the sentencer was precluded from considering

non-statutory mitigating circumstances unless it substantiated any of the state's three statutory mitigating circumstances. The Supreme Court held that the eighth and fourteenth amendments required that the sentencer "not be precluded from considering ... *any* aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio* at 604, 98 S.Ct. at 2964. (Emphasis added).

This concept was further refined in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In *Eddings,* the sentencing judge felt that he could not, as a matter of law, " 'consider the fact of this [defendant's] violent background.' " 455 U.S. at 113, 102 S.Ct. at 876. There was no dispute that the violent background was non-statutory evidence of mitigation. Further, the Oklahoma death penalty statute clearly permitted the defendant to produce such evidence and have it considered. The Court held that

> [i]n this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence.... The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

455 U.S. at 114–15, 102 S.Ct. at 876–77.

More recently, the Supreme Court, in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), made it clear that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances...." 103 S.Ct. at 2750; *Briley v. Bass,* 750 F.2d at 1244. Under *Zant,* "[w]hat is important at the selection [mitigation] phase is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," 103 S.Ct. at 2743–44 (emphasis in original), and the "absence of legislative or court-imposed standards to govern the jury in

weighing the significance" of various factors is not dispositive. *Id.* at 2743–44.

The procedure for the mitigation phase of the trial is set forth in S.C. CODE ANN. § 16–3–20 (cum.supp.1984). Subsection (C) provides: "The judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances otherwise authorized or allowed by law and any of the following statutory aggravating and mitigating circumstances which may be supported by the evidence . . . ."[18]

■ Apparently, the magistrate found the jury charge defective because the jury was not specifically told of other "mitigating circumstances otherwise authorized or allowed by law." In addition, it appears as if he thought the charge overemphasized the role of statutory mitigating and aggravating circumstances to the exclusion of other factors.[19]

Even if all this was true, *Lockett* and its progeny demand no more. The statute allows the defendant to proffer any evidence of mitigation otherwise authorized or allowed by law. Hyman was permitted to do this. He produced testimony from six (6) witnesses that covered his age, childhood, familial history, religious conversion, etc. This is plainly evidence that is "authorized or otherwise allowed by law." In addition, the judge instructed the jury no less than five (5) times that it was to consider *"all"* the evidence. "There is no requirement that the court (or a jury agree) with the defendant's view that it is mitigating, only that the proffer be given consideration." *Raulerson v. Wainwright,* 732 F.2d 803, 807 (11th Cir.1984). *Accord, Dobbert v. Strickland,* 718 F.2d 1518, 1524 (11th Cir. 1983).

*Lockett* does not demand that the trial judge specifically comment on a non-statutory mitigating circumstance. Nor does it demand a jury charge which proportionally discusses non-statutory and statutory circumstances. All that is required is that the statute permit the proffer and the "sentencer . . . listen." *Eddings v. Oklahoma,* 455 U.S. at 115, n. 10, 102 S.Ct. at 877, n. 10. This court cannot conclude that the charge, as a whole, precluded the jury from considering all the evidence proffered. In fact, "[t]he instructions leave the definite impression that the jury was to take into account such evidence as was presented in mitigation and to exercise discretion in reaching a verdict on sentencing, rather than automatically imposing the death sentence upon finding an aggravating circumstance." *Briley v. Bass,* 750 F.2d at 1244. Hyman's assertion falls far short of the standard that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 415 U.S. at 147, 94 S.Ct. at 400. Moreover, if any prejudice resulted from the charge, it was cured by a later instruction. When quizzed by the foreman, the judge responded: "You have to judge the testimony that you've heard [sic] from in this sentencing proceeding now, taking into consideration *the entire testimony in this case,* the exhibits which you've heard [sic], and reach a decision on the recommendation that you, the Jury, would make."[20] [Tr. 529]. (Emphasis added). If the earlier instruction placed a doubt in the jury's mind, then these words obviously removed it. For these reasons,

**18.** The trial judge began his instructions to the jury with these words: "In arriving at your recommendation, you on the Jury may consider any mitigating circumstances otherwise authorized or allowed by law. And you may consider certain so called statutory aggravated—aggravating and mitigating circumstances which are supported by the evidence in trial." [Tr. 514]. The rest of the charge was devoted primarily to an explanation of statutory aggravating and mitigating circumstances and their use in arriving at a sentence. *See* Appendix B.

**19.** As evidence of this, he points to the number of times the judge mentioned *"statutory"* and the colloquy between the judge and the foreman in which the latter asked if the jury had "to prove that he [Hyman] did the actual killing?" [Tr. 528].

**20.** The judge went further specifically answering the foreman's question. "It would be proper for you to consider in matters of mitigation or aggravation *obviously* whether this Defendant used the weapon or whether he didn't . . . ." [Tr. 530]. (Emphasis added).

the recommendation of the magistrate is rejected.

## II. THE "TRIGGERMAN" ISSUE

Magistrate Carr found that the petitioner was *not* denied due process because of the trial judge's failure to present a charge to the jury based on *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). [Mag.Rep. 19–20]. Hyman objects to this finding. He argues that the magistrate misapprehended the proper place in the trial proceedings for a charge based on *Enmund*. "The *Enmund* instruction would not be given to a jury at the *guilt phase*, but instead, is a charge to be given to the jury when the jury is being required to sentence a defendant." [Pet.Obj. 4]. (Emphasis in original). This court does not agree. On this point, the findings of the magistrate are adopted and incorporated into this order by specific reference.

In *Enmund*, the petitioner and a co-defendant were convicted at a jury trial in a Florida court of first-degree murder and armed robbery of two elderly persons. In a separate proceeding, the jury recommended the death penalty for both defendants.[21] The trial judge found four statutory aggravating circumstances and sentenced Enmund to death. Enmund appealed. The Florida Supreme Court affirmed the convicting despite the fact that "[t]here was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered." *Enmund v. State*, 399 So.2d 1362, 1370 (Fla.1981).

In reaching its decision to remand the case, the United States Supreme Court noted that "the record supported no more than an inference that Enmund was the person in the car by the side of the road at the time of the killing, waiting to help the robbers escape."[22] *Enmund*, 102 S.Ct. at 3372. The Court held that the eighth amendment bars the imposition of the death penalty for "one ... who aids and abets a felony in the course of a murder ... but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force ... be employed." 102 S.Ct. at 3376–77.

In so holding, the Court stated that the "focus must be on [the particular defendant's] culpability, not on that of those who committed the robbery and shot the victims for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Id.* at 3377 (*quoting Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978)).[23]

The facts of Hyman's case are significantly different from those presented in *Enmund*. Here, the evidence was uncon-

---

**21.** In Florida, the jury only advises the trial judge on whether to impose the death penalty.

**22.** In *Enmund*, the majority took their view of the facts from the Florida Supreme Court's opinion. Enmund, Jeanette Armstrong, Sampson Armstrong, and Enmund's wife drove in Enmund's car to the home of the Kersey's. Jeanette and Sampson Armstrong went to the door while Enmund and his wife waited in the car. When Mr. Kersey came out of the house, Sampson Armstrong grabbed him, pointed a gun at him and told his wife to take his money. Mr. Kersey cried out for help and his wife came out of the house with a gun and shot Jeanette Armstrong, wounding her. Sampson Armstrong, and perhaps Jeanette Armstrong, then shot and killed the Kerseys, dragged them into the kitchen, took their money and fled.

The minority chastized the majority for their view. They contended that the *trial* judge's findings and the record supported the view that Enmund "had initiated and planned the armed robbery and was in the car during the killings." 102 S.Ct. at 3380.

**23.** *Enmund*, of course, was decided three years after Hyman's conviction. *Lockett* was decided a year before Hyman's trial. Apparently, Hyman thinks the trial judge should have *anticipated* the holding of *Enmund* because in a footnote in *Lockett* the Court observed that it was not addressing the contention "that the death penalty is constitutionally disproportionate for one who has not been proved to have taken life, to have attempted to take life, or to have intended to take life...." 438 U.S. at 609, n. 16, 98 S.Ct. at 2967, n. 16. This argument lacks merit. The Constitution does not require a trial judge to be clairvoiyant. Nonetheless, even if the trial judge could have divined the *Enmund* holding, a charge based upon it would not be applicable to Hyman.

tradicted that Hyman conceived the robbery. Then he, his wife, Iris Midgett, Sue Allday and Bob Hinson drove in Hyman's car with a double-barreled shotgun to the victims' home. Two of the women tried to gain access to the victim's house trailer by asking for help with a flat tire while Hyman, armed with a shotgun, and Hinson, laid in wait to rob the victims. The first attempt failed. Hyman, Allday and Hinson regrouped and again mounted an assault on the trailer. While Allday, now armed with the shotgun, continued to try to coax the victims into opening the door to their residence, Hinson tried to force the door. Hyman laid in wait by the side of the residence. Once inside, Hyman terrorized the elderly men, beating one senseless and shooting the other.

■ It is true that Hyman did not testify at the guilt phase of the trial. Based on the evidence then before the jury, Hyman's culpability was practically undisputed. He could not seriously contend that he "did not himself kill," let alone that he did not intend that lethal force be employed. Therefore, a charge based on *Enmund* would not have been appropriate.

At the penalty phase, Hyman's direct testimony was that he was upset because his brother-in-law had beaten up Hyman's sister. Iris Midgett called a friend of Hyman's and left a message that he should meet her at the Winchester Club because she knew where to locate Hyman's brother-in-law. Iris gave him some kind of pill at the nightclub.

On cross-examination, he stated that he had arrived at the victims' trailer but that he did not intend to go there. Instead, he asserted that he thought he was going to find his brother-in-law. He did not deny *any* of the events that led up to the shooting. He only denied that he killed Teagus Griffis. Despite this denial, the state's evidence was uncontradicted that Hyman intended to kill.

*Enmund* does not provide direct guidance for resolving the issue of the stage in the proceeding where the jury should be instructed. In reaching its decision, the Court relied heavily on the fact that there was no "direct evidence" at trial that Enmund ever intended that lethal force be used. But this cannot be said for Hyman. At the very least, *Enmund* would require there be some evidence to negate the state's proof that the defendant intended that lethal force be employed. Unless this can be shown, a charge based on *Enmund* would not be proper at *any* stage of the proceeding. Hyman does not make this showing. For these reasons, the trial judge committed no error by failing to give a jury charge based on *Enmund*.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Hyman's major claim for habeas relief is that his trial counsel was ineffective. The magistrate found that

> [c]ounsel's errors include a failure to take an adversarial position with regard to the selection of a penalty neutral jury. Further counsel, while going through the motions of calling witnesses in mitigation, seemingly failed to zealously attempt to justify a penalty less than death. Counsel failed to adequately prepare the defendant for or insulate him from devastating cross-examination during the penalty phase which cast him in a highly prejudicial light. Finally, counsel failed to capitalize on the "confusion" surrounding the petitioner's role in the shooting to establish further mitigation. However, there is not a reasonable probability that, absent these errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

[Mag.Rep. 33].

Hyman and the respondents object to these findings. Hyman has three arguments. First, he asserts that counsel did commit these errors and as a result he was prejudiced.[24] Second, he argues that the magistrate did not apply the proper analysis recently enunciated in *Strickland v.*

---

**24.** He also claims that the magistrate failed to find error and prejudice in other particulars.

*Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Third, he contends that the proper analysis is not even applicable to his case because the counsel was so ineffective the court is justified in presuming prejudice.

The respondents challenge the magistrate's findings and argue that no error existed. In essence, they contend the state court reached the correct result in the post-conviction proceedings.

The court will first consider, in reverse order, Hyman's contentions. Then it will treat together Hyman's first argument and respondents' objections.

Hyman argues that his counsel was so ineffective the court need not inquire whether prejudice exists. Accordingly, he concludes that the principles announced in *Strickland* are not applicable to his case. Instead, he likens his case to the more recent *Evitts v. Lucey,* —— U.S. ——, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). This court does not agree. Hyman must demonstrate error and prejudice to make out a claim for ineffective assistance of counsel.

In *Strickland,* the United States Supreme Court gave specific guidance for evaluation of ineffective assistance of counsel claims.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

104 S.Ct. at 2064.

 The two components of a claim for ineffective assistance of counsel are commonly called error and prejudice. To demonstrate error, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 2065. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Turner v. Bass,* 753 F.2d 342, 348 (4th Cir.1985). Furthermore, prejudice to the defense must be present for reversal. *Strickland* requires that

[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland v. Washington,* 104 S.Ct. at 2068, *Briley v. Bass,* 750 F.2d at 1247.

In *Strickland,* the Court was quick to point out that in a narrow class of cases a defendant does not have to demonstrate prejudice.

In certain Sixth Amendment contexts, prejudice is presumed. *Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. Prejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.*

104 S.Ct. at 2067 (citations omitted). (Emphasis added).

In *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), a case decided the same day as *Strickland,* the Court discussed at length "certain Sixth Amendment contexts" where the de-

fendant does not have to demonstrate prejudice because it is presumed. Cronic and two associates were indicted for mail fraud. Shortly before the scheduled trial date, Cronic's retained counsel withdrew. The district court appointed a young real estate lawyer to represent Cronic but allowed him only twenty-five days for pretrial preparation, even though it had taken the government four and one-half years to investigate the case. Cronic was convicted and sentenced after a four-day trial.

The Tenth Circuit Court of Appeals reversed the conviction. It inferred that Cronic's counsel had been ineffective because: "(1) [T]he time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel." *United States v. Cronic*, 675 F.2d 1126, 1129 (10th Cir.1982).

The Supreme Court reversed the Tenth Circuit, stating that the

> five factors listed in the Court of Appeals' opinion are relevant to an evaluation of a lawyer's effectiveness in a particular case but neither separately nor in combination do they provide a basis for concluding that competent counsel was not able to provide this respondent with the guiding hand that the Constitution guarantees.

*Cronic*, 104 at 2049. In so ruling, the Court stated that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[25] *Id.* at 2047. For example, there are those cases where the defendant was completely denied counsel, or, where counsel is prevented from putting the prosecution's case to a meaningful test.[26] When this occurs, the courts *presume* prejudice because counsel, even a fully competent one, cannot provide effective assistance. In these cases, however, there is *usually* an external constraint—some state procedure or ruling by a judge—which prevents counsel from effectively assisting in his client's defense.[27] Such cases are "easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." *Strickland*, 104 S.Ct. at 2067. Thus, as a matter of policy, a reviewing court can easily apply leverage at the crucial point to protect the constitutional right. It is clear, however, that "[a]part from circumstances of [this] magnitude ..., there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 104 S.Ct. at 2047, n. 26.

*Evitts v. Lucey*, —— U.S. ——, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), does not deviate from these principles. Keith Lucey was found guilty by a Kentucky court of trafficking in controlled substances. His retained counsel filed a timely notice of appeal. A Kentucky rule of appellate proce-

**25.** See, e.g., Flanagan v. United States, 465 U.S. 259, ——, 104 S.Ct. 1051, 1054, 79 L.Ed.2d 288 (1984); Estette v. Williams, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Bruton v. United States, 391 U.S. 123, 136–137, 88 S.Ct. 1620, 1628–1629, 20 L.Ed.2d 476 (1968); Sheppard v. Maxwell, 384 U.S. 333, 351–352, 86 S.Ct. 1507, 1516–1517, 16 L.Ed.2d 600 (1966); Jackson v. Denno, 378 U.S. 368, 389–391, 84 S.Ct. 1774, 1787–1789, 12 L.Ed.2d 908 (1964); Payne v. Arkansas, 356 U.S. 560, 567–568, 78 S.Ct. 844, 849–850, 2 L.Ed.2d 975 (1956); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

**26.** See, e.g. Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); Brooks v. Tennessee, 406 U.S. 605, 612–613, 92 S.Ct. 1891, 1895–1896, 32 L.Ed.2d 358 (1972); Hamilton v. Alabama, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); White v. Maryland, 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963); Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); Williams v. Kaiser, 323 U.S. 471, 475–476, 65 S.Ct. 363, 366, 89 L.Ed. 398 (1945).

**27.** This is not to say that a court must always find an external constraint in order to presume prejudice. See, e.g., Flanagan v. United States, 465 U.S. 259, ——, 104 S.Ct. 1051, 1054, 79 L.Ed.2d 288 (1984). "Joint representation of conflicting interest is suspect because of what it tends to prevent the attorney from doing."

dure required appellants to serve on the appellate court the record and a statement of appeal that was to contain the names of appellant, appellees, date of appeal and other information. Lucey's counsel failed to file a timely statement of appeal, but did file one belatedly. Despite the fact that the rule of procedure was non-jurisdictional, the Kentucky court dismissed his appeal. For the next seven years, Lucey tried unsuccessfully to persuade the state court to review his conviction.

The Supreme Court affirmed the district court's and the court of appeal's decisions to grant Lucey habeas relief. It held that "[b]ecause the right to counsel is so fundamental to a fair trial the Constitution cannot tolerate trials in which counsel, though present in name, is *unable* to assist the defendant to obtain a fair decision on the merits." 105 S.Ct. at 836. (Emphasis added).

■ Hyman, however, does not even remotely assert that some state procedure or trial court ruling prevented his retained and appointed counsel from being effective. Nor does he argue that his counsel labored under a conflict of interest. Instead, his focus is solely on counsel's performance. In short, he fails to point to any of the usual "surrounding circumstances" which allow a reviewing court to presume prejudice. Therefore, he must demonstrate prejudice—that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Hyman also objects to the standard that the magistrate employed in reviewing his claim for ineffective assistance of counsel. He asserts that he employed a "strict outcome test," a test rejected by *Strickland.* This objection is without merit. Magistrate Carr devoted more than 30 pages of his report to considering Hyman's claim. He carefully reviewed the *Strickland* decision and correctly set forth its principles of law. Once he found error, he applied the correct standard of prejudice. This is not to say that this court agrees with the findings of error, but only that he applied the correct

legal standard once the error was found to exist.

Before examining the actual conduct of counsel, it would be helpful to review the testimony of Hyman's counsel and that of other witnesses who testified at the post-conviction hearing. Of course, it is the total representation received by Hyman, not the particular representation of one of his attorneys or the other, which must be analyzed in determining whether or not he received effective assistance of counsel.

Hyman's trial counsel was D.J. Stratos and Landon Louthian. Mr. Stratos and Mr. Louthian have both practiced law for well over twenty years. A substantial portion of their work is devoted to the practice of criminal law. Both attorneys were involved in death penalty cases and/or potential death penalty cases prior to the enactment of the present death penalty statute.

Mr. Stratos testified he was retained by the petitioner's brother, Phillip Hyman, shortly after the petitioner was arrested in April of 1979. Although Mr. Stratos did not own current volumes of the South Carolina Reports, South Carolina Digest, or South Eastern Reporter, etc., he had access to these books prior to the trial of this case. Counsel testified that he did not now have a file on Hyman. However, prior to trial, he obtained and reviewed various documents, statements, indictments, arrest warrants, etc., and turned them over to Mr. Louthian, who maintained Hyman's file. Mr. Stratos testified he met with Hyman at the county jail on numerous occasions and spent considerable time discussing with him the facts and circumstances surrounding his case. Mr. Stratos testified that he did not visit Hyman in jail from July 24, 1979, until October 1, 1979, but that he was well aware of the facts and circumstances of the case and did not obtain any new information when he visited him on numerous occasions between October 1 and October 9, 1979.

Mr. Stratos testified that based on the facts as related to him by Hyman and as discovered through his investigation, he advised Hyman to plead guilty to the crime of

murder in exchange for a life sentence. To this, Hyman responded he would not plead guilty because he did not kill Teagus Griffis. Mr. Stratos testified he explained to Hyman on numerous occasions the theory "the hand of one is the hand of all." Counsel spoke with and obtained statements from the state's primary witnesses, and he was present at Hyman's preliminary hearing. He testified that the solicitor's file was available to him and that he reviewed it. Mr. Stratos testified he knew of the existence of Red Coulston but, based on information given him by Hyman concerning criminal involvement between the two, did not feel Coulston would testify for the state. Mr. Stratos reviewed the statements of the state's primary witnesses with Hyman to help prepare him to testify as well as to convince him to plead guilty. Counsel forwarded the statements to Hyman's family in the hope that would persuade him to change his plea. Mr. Stratos testified he spent a considerable amount of time prior to trial locating and attempting to locate defense witnesses to substantiate certain aspects of Hyman's story.

Mr. Stratos testified that in preparation for trial he went over the facts three to four hundred times and rehearsed his jury argument for many hours. He obtained and reviewed the jury list prior to trial. His theory of jury selection was to select jurors who were, in his opinion, "invidious." Counsel testified his theory of the case was basically Hyman and his wife's word against that of the other three accomplices on the issue of who pulled the trigger. In furtherance of this, Mr. Stratos prepared Hyman to testify on his own behalf. Counsel acknowledged that this theory was geared more for the sentencing phase of the trial than the guilt phase because Hyman had no defense as to guilt.

Hyman presented numerous expert witnesses, skilled in the trial of criminal cases, at the evidentiary hearing. All of these witnesses, without exception, testified that there was no issue of substance concerning guilt or innocence and that the only issue present was the issue of punishment. Mr. Stratos testified that Mr. Louthian did most of the work on the mitigation phase of the trial.

Co-counsel Landon Louthian received notice of his appointment on July 24, 1979. He telephoned Mr. Stratos and discussed Hyman's background and the facts and circumstances surrounding this case. Within a few days Mr. Louthian visited Hyman in jail and discussed the case with him. Mr. Louthian testified that although he explained the "hand of one is the hand of all" theory to Hyman at least twice, Hyman still refused to plead guilty.

Mr. Louthian met with a number of petitioner's family members. Included among them were Becky Fain and Gracie Smith, two of his sisters. He attempted to obtain support and assistance from them to mobilize the family in preparations for trial. Counsel questioned various family members, as well as Hyman, concerning any prior emotional, drug or alcohol problems the petitioner may have had, and it was at his suggestion that Hyman was sent to the South Carolina State Hospital for evaluation.

Mr. Louthian talked with most, if not all, of the witnesses presented in mitigation prior to their testifying. He reviewed with them basically the areas he wished them to cover. Counsel testified he was prepared for and expected additional family members to testify during the sentencing phase. Mr. Louthian also expected various members of the family to bring additional witnesses such as neighbors, Hyman's employer, etc., as they had informed him they "would see to it" these people were brought to court. When these family members, as well as the additional witnesses, did not voluntarily appear in court, Mr. Louthian testified he did not feel it would be in Hyman's best interest to force these individuals to testify.

Mr. Louthian testified that he reviewed Hyman's testimony and went over potential cross-examination with him. He felt Hyman's only chance at both the guilt and sentencing phase of trial was for Hyman to take the witness stand.

In addition, counsel testified he discussed the case with various police officers and was aware of Collins Griffis' background and history. He read the South Carolina death penalty statute and did research prior to trial.

Mr. Louthian testified that the jury was approximately one-half white and one-half black, one-half male and one-half female. He felt this was a good mixture of the various members of the community and they would not be death prone.

At the state post-conviction relief hearing, Hyman offered five witnesses who testified that defense counsel's representation was less than that to which Hyman was constitutionally entitled.

Gaston Fairey was Hyman's first witness. In 1982, he had eight years experience as a criminal trial lawyer. He *generally* stressed the need for proper mitigation witnesses, psychiatric testimony, and the need to discuss the details of one's case with other experienced lawyers. He felt that *Witherspoon* was a very important case and that counsel erred when they did not conduct extensive *voir dire*. He knew of none of the details of Hyman's case. He did not discuss it with Stratos or Louthian. After reviewing only the trial transcript, his opinion was that counsel had committed several errors.

Arthur Howe was Hyman's second witness. Mr. Howe is a former United States Attorney and has been practicing law since 1950. He discussed *generally* the need for a good attorney-client relationship, proper factual investigation, scene-of-the-crime visitation and psychiatric evaluation. He *generally* noted the importance of the mitigation phase of the trial and of trying to show that a defendant did not do the killing. Mr. Howe testified that, based upon his opportunity to observe counsel in *other* cases, Stratos and Louthian were not competent to try a serious criminal or civil case. His knowledge of counsel's conduct in this case was gleaned from only *reviewing* the transcript. He opined that the transcript revealed several errors by counsel.

Hyman's third witness was Dan Bowling. In 1982, Mr. Bowling had eight years of experience as a trial attorney. He, too, discussed *generally* the benefits of maintaining a good attorney-client relationship, factual investigation before trial, etc. He reviewed only the transcript of Hyman's trial and found several "appalling" errors. [PCR Tr. 424]. He did not talk with Louthian or Stratos. He had no knowledge outside of the transcript of the facts and circumstances of counsel's conduct. After being presented with a lengthy hypothetical question, Mr. Bowling opined that Hyman had received "grossly ineffective assistance of counsel." [PCR Tr. 431].

DeRosset Myers also testified on behalf of Hyman. Mr. Myers has practiced law as a trial attorney since 1948. Like the others, he had only reviewed the trial transcript and had no other knowledge of the particular facts and circumstances of Hyman's case. He was "appalled" that Hyman's counsel did not participate in a "meaningful examination of the individual jurors." [PCR Tr. 465]. It appeared to him that counsel was not familiar with the South Carolina death penalty statute, and he could not understand why counsel filed no pretrial motions. He further stated that counsel made a gross error of judgment when Hyman took the witness stand and was cross-examined by the solicitor. Predictably, when confronted with a long laundry list of errors, he stated that counsel had been ineffective.

David Bruck was Hyman's fifth witness. In 1982, Mr. Bruck had six years of experience as a criminal trial and appellate lawyer. It was his opinion that counsel: should have requested a sequestered *voir dire*, should have been familiar with *Lockett v. Ohio;* should have been familiar with the death penalty statute, etc. Noting that it was "very hard from a cold record to determine that" counsel was ineffective, he nonetheless stated that counsel had not been competent. [PCR Tr. 515].

▮▮▮ Despite the reams of testimony produced by Hyman, this court is of the

opinion that it is of little or no use in determining whether *D.J. Stratos* and *Landon Louthian* were ineffective in the trial of *William Gibbs Hyman.* Generalities are of no assistance to this court in determining whether competent service was rendered. *Marzullo v. State of Maryland,* 561 F.2d 540, 544 (4th Cir.1977). Most of the opinions offered were backed by no authority and lend little support to the claim of ineffective assistance of counsel. None of the witnesses interviewed Hyman, Louthian or Stratos. The witnesses who were present at some portion of the trial and who did have some first-hand knowledge of counsel's conduct were never solicited for their opinions. Courthouse innuendo is not helpful in reaching a judgment on whether counsel did or did not commit error. Neither is counsel's alleged performance in other cases. Hyman's lawyers may be guilty of poor taste. They may be eccentric. But these character traits are generally not probative of counsel's performance in a specific case. The testimony of all of the witnesses shows that they had no knowledge of the facts of Hyman's case.

In analyzing the allegation of ineffective assistance of counsel, this court is bound to examine the challenged legal representation in the context of all the facts and circumstances surrounding Hyman's case. "The normal competency standard is necessarily broad and flexible because it is designed to encompass many different factual situations and circumstances." *Marzullo v. State of Maryland,* 561 F.2d at 544. A general discussion of *voir dire,* psychiatric testimony, mitigation witnesses and the like is of no consequence. The focus of this court must be on counsel's conduct in *this* proceeding. When discussing particular trial error or counsel's conduct as a whole, hindsight is of no use. The evaluation must be from "counsel's perspective at the time." *Strickland v. Washington,* 104

S.Ct. at 2065. The witnesses offered by Hyman failed to do this. They offer the court no basis for overcoming the strong presumption that counsel's conduct was the result of informed judgment rather than error.

In a federal habeas challenge to a state conviction, the state's conclusion that counsel rendered effective assistance is not a finding of fact binding on a federal court to the extent stated by 28 U.S.C. § 2254(d). "Rather . . . it is a mixed question of law and of fact. . . ." *Strickland,* 104 S.Ct. at 2070. While state courts' factual findings are subject to deference under § 2254(d), "the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 2070.

The magistrate found counsel erred by failing to take an adversarial position with regard to the selection of a penalty neutral jury. This finding is based upon: (1) Stratos' admission that he was not familiar at the time of trial with footnote 21 in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), or the juror exclusion provisions of the South Carolina death penalty statute; (2) Louthian's admission that he could not immediately recall *Witherspoon's* footnote or the provisions of the South Carolina death penalty statute for excluding jurors, and (3) counsel's failure to conduct sufficient jury *voir dire.* This court, however, is of the opinion that counsel committed no error with regard to the selection of a penalty neutral jury.

In a recent case, *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), Justice Rehnquist discussed defense counsel's use of *Witherspoon's* footnote 21 when selecting a jury in a death penalty case.[28] The Court held that the standard in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct.

---

28. *Witherspoon's* footnote 21 permits jurors to be excluded for cause if they make it "unmistakably clear (1) that they would *automatically* vote against imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or

(2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Witherspoon,* 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. (Emphasis in original).

2521, 65 L.Ed.2d 581 (1980), should be applied and it rejected the standard in *Witherspoon's* [29] footnote 21. Under *Adams,*

"a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

*Wainwright v. Witt,* 105 S.Ct. at 850 (*quoting Adams v. Texas,* 448 U.S. at 45, 100 S.Ct. at 2526). (Emphasis in original).

Plainly,

there is nothing *talismanic* about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries.... Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of ... [A] defendant ... being tried for a capital crime ... is [not] entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor.

*Id.* at 852.

Since there is nothing "talismanic" about *Witherspoon's* use in jury selection, it would follow that the failure of counsel to be even totally unfamiliar with its holding or the footnote would not be professional error *per se.* The South Carolina court, reviewing the *voir dire* examination in this case, applied the *Adams v. Texas* standard.

A review of the *voir dire* examination in this case reveals that the prospective jurors were asked if they could give both the State and the [Applicant] a fair and impartial trial. The *voir dire* conducted ensured the [petitioner] was so tried. *See Adams v. Texas* ....

*State v. Hyman,* 276 S.C. at 559, 281 S.E.2d at 211–12. This record reveals that the judge, defense counsel and the prosecution conducted the *voir dire* examination to ensure that impartial jurors were chosen— that is, jurors whose views would not prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths.

S.C.CODE ANN. § 16–3–20(E) (cum. supp. 1984) sets forth what Hyman terms a juror exclusion provision. It provides:

In every criminal action in which a defendant is charged with a crime which may be punishable by death, a person may not be disqualified, excused or excluded from service as a juror therein by reason of his beliefs or attitudes against capital punishment unless such beliefs or attitudes would render him unable to return a verdict of guilty according to law. (Emphasis added).

There is also nothing "talismanic" about this state law. It simply means that the quest should always be for a juror who can set aside whatever personal biases he has and perform his duties as a juror in accordance with his instructions and oath. Hyman's counsel, while perhaps unaware of the precise code sections and footnotes, participated in the jury *voir dire* to ensure that this was accomplished. As such, there is no error present.

In addition, the mere fact that it was *possible* to conduct more extensive *voir dire* does not require the conclusion that Hyman's counsel committed unprofessional error. The testimony at the postconviction relief hearing showed that counsel utilized the computer printout listing the names, ages, sex, address, occupation, etc., of the jury panel from which Hyman's jury was selected. Additional information on the persons presented for jury duty was obtained from the trial court's *voir dire* of the panel. While additional investigation

---

**29.** The Court rejected the *Witherspoon* test for three reasons. First, it makes no difference whether a venireman would impose the death penalty under certain personal standards. The State can still challenge the venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. Second, the statements in *Witherspoon's* footnotes are mere dicta. Third, *Adams* is the proper standard because it is in accord with the traditional reasons for excluding jurors. *Wainwright,* 105 S.Ct. at 851–52.

into a juror's background can be conducted, and while it might be the better practice to conduct further investigation, the scope of *voir dire* is largely a tactical decision; and it is reasonable that a lawyer may believe that intensive questioning may alienate jurors or that the information he has gained allows him to make a competent professional judgment. Therefore, the lawyer would choose a more limited approach. As stated in *State v. Smart:*

> The function of *voir dire* examination, ... is to determine specific and real bias or interest in jurors and not to develop personality profiles.

> \* \* \* \* \* \*

> We suggest to trial judges that an examination of jurors by the Court ... prior to their examination by counsel, could afford the basis for proper limitation of the questioning by counsel to relevant matters, if not the elimination of the necessity for further examination in certain areas.

> The unbridled examination of jurors by counsel serves to not only unnecessarily add to the length and expense of the trial, but also serves to antagonize jurors and lessen public respect for jury duty. The extent to which *voir dire* examination is being permitted by trial judges causes this Court concern, and therefore, this admonition.

278 S.C. 515, 523, 299 S.E.2d 686, 691 (1982).

■ The magistrate also found that, while going through the motions of calling witnesses in mitigation, counsel *seemingly* failed to zealously attempt to justify a penalty less than death. There is not, however, any evidence in the record to support this conclusion and any such reference to the evidence is noticeably absent from the magistrate's report. This conclusion can only be reached by the use of subjective hindsight. Moreover, it takes the personal style of oral advocacy, which differs markedly from lawyer to lawyer, and elevates it to error of constitutional proportions. *Strickland* specifically prohibits this.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is a defendant must overcome the presumption that under the circumstances, the challenged action might be considered sound trial strategy.

104 S.Ct. at 2065. (Citations omitted). Hyman failed to produce, and the magistrate failed to point to, a shred of evidence which suggests that counsel's arguments to the jury, either at the guilt or penalty phase of the trial, were not the result of a deliberate informed strategy. A mere preference for one oral advocacy style over another will not suffice to prove that counsel's representation fell below an objective standard of reasonableness.

■ Turning to another finding of the magistrate, the respondents also challenge the conclusion that Hyman's counsel failed to adequately prepare the defendant for or insulate him from devastating cross-examination during the penalty phase which cast him in a highly prejudicial light. Prior to the guilt phase of the trial, Hyman was adequately prepared by his attorneys to take the witness stand. He would tell his side of the story—that he was drinking, taking pills, looking for his brother-in-law, and, most importantly, that he did not kill Teagus Griffis. Hyman, however, made a last-minute unilateral decision not to testify. [PCR Tr. 981]. After he was convict-

ed, his attorneys discussed his testimony with him while he was still at the courthouse. [PCR Tr. 993]. The next day Hyman informed his attorneys that he wanted to take the witness stand and they again discussed his testimony. "[Hyman] just said that he wanted to take the stand then and talk." [PCR Tr. 993]. This time, he did take the stand. He related his story just as he had told it to his attorneys. The problem, of course, is that the jury obviously found it to be an unbelievable story.

Some three years later, at the post-conviction hearing, Hyman had a story that was greatly refined. He claimed that he passed out on the way to Ravenel. Once he regained consciousness, he saw that Sue Allday was going to commit a robbery. He "figured that there was going to be some gunshots, so [he] crawled up underneath the trailer." [PCR Tr. 792]. He did not emerge until after the shooting was over and only helped to disarm Mr. Griffis. Rather than telling Hinson he would shoot him, Hyman helped him to the car. But the problem here is that it appears that Hyman failed to relate this story to his attorneys, or to the jury, in 1979. So it is not much help.

Without exception, every attorney at the post-conviction hearing testified that Hyman's guilt was overwhelming and that he should have pled guilty. Moreover, most of them agreed that a "jury would just not understand the vicarious violence that occurred on the day in question, and that they were going to put his client in the electric chair." [PCR Tr. 290]. This was clearly a death penalty case. As was his right, Hyman chose not to plead. In so doing, however, he became the author of his own dilemma. He made the job of defending him even more difficult by making last minute unilateral decisions. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 104 S.Ct. at 2066.

Hyman had given a statement to the arresting officer indicating that he had not gone to Ravenel that night but instead was with a friend. Faced with testimony of three accomplices, he must have come to the conclusion that he would have to take the stand and, in so doing, take his lumps for the earlier inconsistent statement. This would be the only way to save his life. The only thing that counsel could have done differently was to bring out the inconsistent statement during direct examination. This could not be done, however, because the statement had not been obtained by counsel.[30] Yet these facts do not support a conclusion that counsel's conduct fell below an objective standard of reasonableness. In short, in light of all the facts and circumstances, this court cannot conclude that counsel's preparation of Hyman was outside the range of professionally competent assistance. Given the overwhelming odds and Hyman's last minute decision, they made the best of a bad situation.

█ Finally, the court turns its attention to the magistrate's finding that counsel failed to capitalize on the confusion surrounding the petitioner's role in the shooting to establish further mitigation. This finding is simply not supported by the record. Neither Hinson or Midgett actually saw the killing take place. They were outside the trailer and only heard the shots. Allday did not see Hyman fire the fatal shot, but saw Hyman standing over Teagus Griffis right after the shot was fired. Both Allday and Midgett recalled Hyman's oral confessions. Likewise, a reading of the trial transcript reveals that defense counsel tried unsuccessfully to show that the deceased was shot by someone other than the defendant. Unfortunately for Hyman,

---

**30.** The record is not clear that Hyman's oral statement had been transcribed and was in the solicitor's file when Hyman was cross-examined. At the post-conviction relief hearing, Hyman's counsel asked the solicitor "if it appears" that the statement was in the file. [PCR Tr. 633]. The solicitor answered, "Yes, this was." [PCR Tr. 634]. However, when Louthian was asked about the statement, he recalled that it might not have been reduced to writing and, if it was, he "never got it." [PCR Tr. 953].

there was not a great deal of confusion present. The witnesses were steadfast in their accounts.

Hyman points to the failure of counsel to obtain and introduce Collins Griffis' statement which was given to an investigating officer. In this statement, Griffis told the policemen that a woman shot his brother with his own shotgun. However, when shown specific documents from the solicitor's file, Mr. Louthian, a former policeman, indicated that he did not think they were of overwhelming importance because they were only the early ideas of an investigating officer. Stratos did not capitalize on the surviving victim's statement because he felt the survivor was not a competent witness. A reading of Mr. Griffis' testimony reveals that Stratos made a correct assessment. As a witness for the state, Griffis added little to the case. He generally indicated a man killed his brother, but his testimony, taken as a whole, shows a lack of specific knowledge about the killing and could have as easily been interpreted as showing Hinson did the shooting. While there are always certain things which *hindsight* reveals could have been done, counsel cannot be faulted for making an informed decision not to interview or call every witness or place greater emphasis on certain aspects of their defense. Here, counsel tried unsuccessfully to capitalize on the confusion surrounding the killing. They made basic, solid arguments. Therefore, it cannot be said that counsel was inadequate.

 At page 58 of his report, the magistrate found that Hyman's counsel failed to adequately prepare for cross-examination of state witnesses and failed to study or explore possible legal challenges to the death penalty statute. In the body of the report, there is no discussion of any of the facts and circumstances surrounding counsel's failure to prepare for cross-examination. The magistrate did note that counsel failed to obtain a list of prospective state witnesses or any criminal or psychiatric histories of the witnesses, if such histories existed. The record does not reveal that the solicitor would have given counsel a list of prospective witnesses. In fact, after reading the trial transcript and post-conviction hearing transcript, this court is of the opinion that counsel prepared adequately for cross-examination. In addition, their actual cross-examination at time of trial afforded Hyman reasonably effective assistance. It is true that counsel failed to study or explore possible legal challenges to the death penalty statute, but it would not automatically follow that the failure to do so would mean that counsel committed unprofessional error. No constitutional defects are known to exist in the South Carolina death penalty statute. Even if the court assumed that such a failure is ineffectiveness *per se*, there would be no prejudice to Hyman.

Hyman objects to the magistrate's conclusion that counsel did not err when they failed to develop testimony consistent with *Enmund v. Florida*. As indicated earlier, *Enmund* was decided three years after Hyman's conviction. Even if counsel had been thoroughly familiar with the footnote in *Lockett v. Ohio*, which arguably "foreshadowed" *Enmund*, they cannot be faulted for failing to develop testimony for an issue not yet settled by the courts. In any event, Hyman's post-conviction recollection is much different from that presented at trial. At trial, counsel had a duty to prepare Hyman to tell *his* story in the most convincing manner. Counsel had no duty to convince Hyman to change his story so that an *Enmund* issue would be present. Furthermore, the trial judge allowed the jury to consider as a non-statutory mitigating circumstance whether Hyman did the killing. This instruction gave Hyman more of a benefit than a charge properly constructed under *Enmund*.

 Hyman also argues that effective counsel would have convinced him to plead guilty by adequately explaining the law to him. The record reveals that counsel adequately explained the law to Hyman on numerous occasions. It would be strange, indeed, for this court to hold that, despite attempts by counsel, family, and the trial

judge, counsel was ineffective because they could not *force* their client to accept a plea agreement that would be in his best interest. ·The ultimate decision was Hyman's. At this point, he cannot blame others for a decision that was his and his alone.

■ Hyman faults the magistrate for not finding that counsel committed error by failing to develop further psychiatric testimony. At the request of counsel, Hyman was admitted to and evaluated by the South Carolina State Hospital. Counsel did not obtain all of Hyman's records from the hospital, but these records contained little, if any, favorable information. Counsel made no additional attempts to obtain an independent psychiatric evaluation; but this decision was, in light of the surrounding facts and circumstances, an informed judgment which was reasonable. Louthian had been told by family members that Hyman had no history of psychiatric or emotional problems. Also, the petitioner never told them that he had been evaluated by a psychoanalyst. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 104 S.Ct. at 2066.

■ Turning to the issue of prejudice, even if counsel did commit some specific error, or if their conduct, as a whole, was incompetent, Hyman fails to demonstrate that the result of the trial either at the guilt or penalty phase is unreliable. Almost every one of Hyman's witnesses, in one way or another, reached the same conclusion: "He [Hyman] didn't have any defense...." [PCR Tr. 228].

> Some errors will have a pervasive effect on inferences to be drawn from the evidence altering the entire evidentiary picture and some will have an isolated trivial effect. Moreover, a verdict or a conclusion only weakly supported by the record is more likely to have been effected by errors than one with overwhelming record support.

*Strickland*, 104 S.Ct. 2069.

The magistrate thoroughly discussed the issue of prejudice in his report. There is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. That is, Hyman has not presented a probability sufficient to undermine confidence in the outcome of his trial. On this point, the court incorporates and adopts these findings [Mag.Rep. 26–34] by specific reference.

Finally, Hyman notes that he does not abandon any of the other grounds raised in his petition, and he urges the court to consider them and grant him relief. Title 28, United States Code, Section 631(b)(1)(B), provides in part that "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Specifically, the court has reviewed the magistrate's findings that:

(1) Counsel conducted an adequate factual investigation [Mag.Rep. 14];

(2) Hyman's right to an impartial neutral jury was not violated [Mag.Rep. 25];

(3) The trial court committed no error by refusing to permit Hyman to discharge Stratos as trial counsel [Mag.Rep. 35–6];

(4) The jury was not improperly charged that its decision to sentence Hyman to death was merely a "recommendation" [Mag.Rep. 47];

(5) The trial judge did not commit error by improperly disqualifying jurors because of their beliefs or attitudes against capital punishment [Mag.Rep. 48];

(6) Hyman was not penalized for exercising his right to a trial by jury because the solicitor would have allowed him to plead guilty [Mag.Rep. 49];

(7) The death penalty is not disproportionate to the crime committed by Hyman [Mag.Rep. 49, 50];

(8) The Solicitor's plea bargain agreement was not unconstitutionally arbitrary [Mag.Rep. 55], and

(9) Hyman was not deprived of his right to be present at all stages of his trial [Mag.Rep. 56].

The court has fully reviewed Hyman's petition, the briefs of counsel, and pertinent legal authority. It is of the opinion that the magistrate reached the correct result on these nine issues. The magistrate's findings are adopted and incorporated into this order by specific reference. It is, therefore,

ORDERED, that William Gibbs Hyman's petition for habeas relief be, and the same is hereby, denied. It is

ORDERED FURTHER, that the respondents' motion for summary judgment be, and the same is hereby, granted.

AND IT IS SO ORDERED.

## APPENDIX A

Mr. Foreman, ladies and gentlemen of the Jury, the State charges the Defendant, William Gibbs Hyman, with the crime of murder and also armed robbery in this Indictment. The Indictment names Doris Hyman, his wife, the case as you know is being prosecuted against William Gibbs Hyman, the Defendant, in this particular trial. The Indictment charges that William Gibbs Hyman and Doris Hyman did in Charleston County on or about the 24th day of March, 1979, with malice aforethought kill one Teagus Griffis by means of a double barrel shotgun and that the said Teagus Griffis did die as a proximate result thereof on or about the 24th day of March, 1979.

And in count two charges William Gibbs Hyman and Doris Hyman did in Charleston County on or about the 24th day of March, 1979, while armed with a deadly weapon; to wit: a double barrel shotgun, feloniously take from the person in the presence of Teagus Griffis, by means of force or intimidation, goods or monies of the said Teagus Griffis, such goods and monies being described as a shotgun. The shotgun as charged in the Indictment, and taken against the peace and dignity of the State and contrary to the Statute in such cases made and provided.

Now, the Indictment is the document which was submitted to the Grand Jury. It was prepared by the Solicitor and submitted to the Grand Jury. The action of the Grand Jury returning a true bill is not evidence in the case. You've heard the evidence from the witnesses under oath on the stand.

Now, the Indictment is not evidence. It's the charge which brings this Defendant to this Court for trial. He has entered a plea of not guilty; and that plea of not guilty casts the burden on the State to prove him guilty beyond a reasonable doubt. He has not testified himself in this case and that's his right. It's not a circumstance which you may take into consideration in reaching your decision in this case. You shouldn't allow the fact that the Defendant hasn't testified to enter into your discussions. Under the Constitution of both the State and of the United States, it's a right of a person who is charged with a commission of a crime to testify or not. The burden of proof is on the State to establish the guilt of a person accused by competent testimony beyond a reasonable doubt.

I charge you also that in connection with the incident as alleged in the Indictment, you've heard that others alleged to have been present and aiding and assisting in the commission of the crime charged have entered guilty pleas to at least the offense of murder; two of these other individuals alleged to have been present have; one other has entered a plea of guilty to another offense, accessory before the fact of a felony. These pleas cannot be considered by you against this Defendant; that is, the fact that they have pled guilty, that in and of itself is not evidence against this Defendant. The testimony of these individuals who have pled on other occasions is evidence and this testimony which you have heard may be considered by you along with all the other evidence in the case in reaching your verdict.

Now, the burden is on the State to prove this Defendant guilty beyond a reasonable doubt before he may be convicted of either murder or armed robbery. He is presumed under our law to be innocent and he comes

into Court clothed with this presumption of innocence and the presumption of innocence continues throughout the trial until it is removed by evidence which satisfies you on the Jury of his guilt beyond a reasonable doubt.

The phrase reasonable doubt means what the words imply; that is, a reasonable doubt, not any sort of a doubt. A reasonable doubt is not a slight doubt; it's not a fanciful doubt; but a reasonable doubt is sometimes defined as a substantial doubt. It's a doubt arising out of the evidence or the lack of evidence in the case. It's a doubt for which a person is honestly seeking to find the truth can give a reason. So if you have such a reasonable doubt in your mind as to whether the State has proven this Defendant guilty, you must resolve that reasonable doubt in his favor and acquit him.

Now, I'll deal first with the offense charging count one of the Indictment, murder; and then after that, deal with the second count charge of armed robbery. Murder as you have been advised is the killing of any person with malice aforethought; that's either expressed malice or implied malice. So in order to convict a person of the offense of murder, the State must not only prove the killing of the deceased by the Defendant, but that it was done with malice aforethought. And this proof must be beyond a reasonable doubt. Malice in the definition of murder is a technical term. Malice imposes wickedness. Malice excludes any just cause or excuse for the act. Malice is something which springs from wickedness, from depravity, from a depraved spirit, a heart which is devoid of social duty, one fatally bent on mischief. Malice in the definition of the offense of murder which I've explained to you, is the killing of any person with malice aforethought, either expressed or implied malice. Malice may be expressed or it may be implied. These words, expressed or implied, don't mean different kinds of malice, but the manner in which malice may be shown to exist; that is, malice may be shown either by direct evidence or by circumstantial evidence or inference. Malice may be expressed; for example, where you have previous threats of vengeance or where there is a lying in wait or where the circumstances show directly that an intent to kill was entertained. It may be implied; for example, where there's no expressed intent to kill proven by the direct evidence, it is indirectly and necessarily inferred from the facts and the circumstances which were in fact proven. And malice is implied, it's presumed from the willful, the deliberate, the intentional doing of an unlawful act without just cause or excuse.

So, generally speaking, malice means the doing of a wrongful act, intentionally and without any justification or excuse. Now, even if all the facts has proven and is sufficient to raise a presumption of malice, this presumption would be rebuttable and it's for you on the Jury to determine from all of the evidence whether or not malice has been proven beyond a reasonable doubt. Malice is presumed or implied from the use of a deadly weapon. Where the circumstances relating to the death of the deceased are brought out in the evidence, the presumption of malice which is implied from the use of the deadly weapon vanishes and the burden is on the State to prove malice whenever a deadly weapon is used by evidence which satisfies you on the Jury beyond a reasonable doubt. To convict a person of murder, the malice must be aforethought. And it must be present, aforethought. The law doesn't require that malice shall exist for any particular length of time before the act is committed; but it must be aforethought. It must be the accommodation of the previous evil intent and of the act which produces the fatal result. And it must be proven beyond a reasonable doubt. The State is not required to prove any motive for the killing. So that is the law with regard to the offense of murder which is the killing of any person, with malice aforethought, either expressed malice or implied malice.

The second count of the Indictment charges the offense of armed robbery. Robbery is the felonious or wrongful tak-

ing and carrying away of the property of another from his or her person or in his or her presence by violence or by putting the person in fear. It includes larceny or stealing. All of the elements which are necessary to make up larceny or stealing are necessary to constitute the offense of robbery. In addition, the stealing must be accomplished by violence or by putting the person in fear. The offense of robbery is made up when these things are shown: that the property of another, regardless of its value has been taken; after taking, it is carried away; and that the taking and carrying away was with the intent of depriving the owner of the property; that is, with the intent to steal it. And the property must have been taken from a person or in the presence of the owner. And the taking must not only be without the consent of the owner but it must be accomplished by force or violence or putting the person in fear.

The offense is armed robbery, where the robbery was committed with a deadly weapon; that is, the person who committed the crime of robbery, actually had and used a deadly weapon to obtain possession of the property or to put the person in fear in order to obtain the possession of the property.

I charge you further that voluntary intoxication is no reason or is no excuse for committing a crime. So intoxication is no excuse unless the person has indulged so much that his mind has become so impaired that he doesn't have enough brain matter left to distinguish or understand right from wrong. I charge you that when one voluntarily drinks intoxicating liquors and becomes intoxicated, of whatever degree, and if, while in that condition commits an act which would be a crime if it had been committed by a sober person, the fact of drunkenness would not relieve the intoxicated person from responsibility.

Those offenses such as the offense of murder and armed robbery in which there must be a specific intent, the Defendant's drunkenness, if shown by the evidence may be considered by you in determining wheth-

er the Defendant committed the offense with the intent to do so or whether he was present aiding, assisting others in the commission of the offense.

Now, I charge you that when two or more persons combine and aid and encourage and assist each other in the commission of a crime, that all who are present and aid in its commission are principals; and under those circumstances where two or more persons aid, encourage, abet, and assist each other in the commission of a crime, they are all equally guilty. So when two or more persons combine together to commit a crime and the crime is in fact committed, all of those present at the scene of the crime to aid and assist in its commission are guilty. The act of one under these circumstances becomes the act of all. It makes no difference by whose immediate agency the crime is committed because under these circumstances, all are principals. The mere presence of a person at the scene of a crime without any intent to aid or assist in its commission would not constitute guilt. So the burden is on the State to establish beyond a reasonable doubt that this Defendant was in fact present; that he was there with a criminal intent; that is, with the intent either to commit the crime or to aid, encourage, assist others or another in the commission of the crime.

Now, in many cases, the law recognizes two types of evidence. And an offense may be proven by both of these types; that is, direct evidence and indirect or circumstantial evidence. By direct evidence of a fact is meant the testimony of persons who have perceived its existence by means of their senses. For example, when a person sees a crime committed and comes into Court and testifies as to what he saw, that's direct evidence. Indirect or circumstantial evidence is different. By this is meant the proof of some other fact or facts from which taken either singularly or collectively when existence of a particular fact in question may be inferred as a necessary consequence. So crime may be proven by circumstantial evidence as well as by direct evidence, the testimony of eye witnesses.

Circumstantial evidence is good evidence if it meets the legal test. And to the extent that the State relies on the circumstantial evidence, the State must prove all of the circumstances relied on beyond a reasonable doubt; and these circumstances must be wholly and in every particular perfectly consistent with one another and the circumstances must point conclusively; that is, to a moral certainty to the guilt of the accused to the exclusion of any other reasonable explanation. That is, the circumstances must be absolutely inconsistent with any other reasonable explanation other than the guilt of the accused when you are considering circumstantial evidence as well as opposed to direct evidence. When you consider circumstantial evidence, you must seek some reasonable explanation other than the guilt of the accused; and if such a reasonable explanation can be found, then you may not convict under circumstantial evidence.

I charge you that the mere fact of circumstances are strongly suspicious and that a Defendant's guilt is probable is not sufficient to sustain a conviction because the proof offered by the State must exclude every reasonable explanation except that of guilt and must satisfy the Jury beyond a reasonable doubt.

Now, you on the Jury are the sole Judges of the facts in this case. It's my duty to rule on the admissibility of the testimony, but the weight or the probative value of the evidence which you have heard is entirely for you to determine. As Judges of the facts, it's your duty to weigh the evidence, to consider this testimony, and to determine what the facts are from the testimony which you have heard from these witnesses under oath on the stand. I can't suggest any opinion that I have or may not have about the facts in this case. And any opinion you may have gathered from any of my rulings in this case, you will necessarily disregard. So you are the sole Judges of the facts. As Judges of the facts, you have to pass on the believability of the testimony of these witnesses. You have a right to believe one and disbelieve another. You may believe a part of a witness's testimony, if you have some sound reason, you may reject it entirely. So in determining the believability or the credibility of the testimony of these witnesses, you on the Jury may take into consideration such things as their opportunities for observation, their knowledge of these matters about which they have testified, any interest they may have in the outcome of the trial, any bias, any prejudice they may have. You may also consider their demeanor, their appearance on the stand. You may consider anything which in your good judgment tends to show whether a witness is telling the truth. Your objective is to find the truth whether it comes from a witness for the State or the Defendant.

Having determined what the facts are, you then have the duty of applying the law as charged by the Court to the facts which you find and in that manner, you reach a true verdict. It's your duty and mine within our respective spheres to see that both the State and this Defendant have a fair and impartial trial. Remembering that the Defendant is entitled to the benefit of any and every reasonable doubt; of any and every phase of the case. So if you have a reasonable doubt as to whether the Defendant is guilty or not guilty, it will be your duty to acquit him. If, however, the State has proven his guilt beyond a reasonable doubt, it will be your duty to convict him.

### APPENDIX B

THE COURT: Mr. Foreman, ladies and gentlemen, you have reached the stage now in the trial where I'm required to ask the first twelve Jurors who were sworn, whether you are each well and able to go forward. If any Juror is ill, unable to proceed because of some health or physical reason, will you please hold up your hand? Seeing no response, now from the first twelve Jurors, I excuse Mrs. Moss and Miss Lamb, our alternates. Thank you very much for your assistance this week.

(The two alternate Jurors excused from the service of this case.)

Mr. Foreman, ladies and gentlemen of the Jury, as you know the Defendant, William Gibbs Hyman, has been found guilty of the offense of murder and also of armed robbery. It's your duty at this time to determine what sentence you will recommend that the Court impose on the Defendant for having been convicted of the offense of murder. You on the Jury must now decide whether to recommend that the Court impose the life sentence or that the Court impose the death sentence which in this State is, of course, by electrocution.

In arriving at your recommendation, you on the Jury may consider any mitigating circumstances otherwise authorized or allowed by the law. And you may consider certain so called statutory aggravated—aggravating and mitigating circumstances which are supported by the evidence in the trial.

I charge you, therefore, that in arriving at your decision, you must first determine from the evidence which was offered at the trial whether the alleged statutory aggravating circumstances one or more of these existed beyond a reasonable doubt at the time the victim in this case was murdered. So we will deal first with the question, what is a statutory circumstance? A statutory aggravating circumstance is a fact, an incident, a detail, or an occurrence which the General Assembly of this State has declared by Statute would make worse; that is, aggravate the offense of murder. When that fact, that incident, that detail, or occurrence accompanies an act of murder. A statutory aggravating circumstance is one recognized by Statute as a circumstance which increases guilt or the enormity of the offense, or a circumstance which adds to the injurious consequences of the offense.

Before you can recommend the imposition of the death sentence on the Defendant, all twelve Jurors must agree that beyond a reasonable doubt the evidence in this case discloses the existence of at least one alleged statutory aggravating circumstance. So unless the Jury finds unanimously beyond a reasonable doubt that the evidence discloses the existence of one or more of the alleged statutory aggravating circumstances, you cannot recommend that the Defendant be sentenced to death.

The statutory aggravating circumstances which the State alleges existed here beyond a reasonable doubt are those which have been alleged by the State to have existed at the time of the commission of this murder. And they are these: One, that the murder was committed while in the commission of an armed robbery. And two, that the murder was committed while in the commission of a burglary. You have had the law so far as armed robbery explained to you and you've reached a decision that the Defendant is in fact guilty of the offense of armed robbery. I'm not going to repeat the law as to armed robbery in detail except to point out that the State in order to prove the charge of armed robbery must show that the robbery was committed with a deadly weapon.

The offense of burglary is defined as the breaking and the entering of a dwelling house of another in the nighttime with the intent to commit, to commit a felony therein. And so burglary is the breaking and entering of a dwelling house of another in the nighttime with the intent to commit a felony therein. To make up this offense of burglary, there must be a breaking either an actual breaking or a constructive breaking. There must be an entry. The entry must be in the nighttime and the breaking and entering must be of a dwelling house; and the breaking and entering must be with the intent to commit a felony therein. So these elements are broken down into various elements: breaking, entry, nighttime, a dwelling house, intention. To constitute a breaking, there must be some degree of force used. The offense of burglary is not one which is made out where a person enters through an open door or an opened window even though the other elements of the offense are present. There must be some physical breaking or the breaking may be constructive; that is, the

entry must have been gained by threats or fraud or some conspiracy. Some force which permitted the intruder to gain entry into the dwelling house. There must have been an entry as well as the breaking. It's not necessary that the entire body of a person get into the house, but if any part of the body such as a hand or foot enters, that is a sufficient entry. The breaking and entering must have occurred in the nighttime and that's the period between sunset and sunrise when there's not sufficient natural light to discern a person's face. There must have been a dwelling house involved; and a trailer used for habitation would be a dwelling house within this definition of burglary. To make out the offense of burglary, both the breaking and the entering must have been with the intent to commit a felony therein. And it's essential that the wrongful intent exist at the time of the breaking and the entering. The stealing from a home is a felony. So it follows from what has been said in order to justify a verdict or rather finding that the murder was committed during the commission of a burglary, you must find that the State has proven beyond a reasonable doubt by the testimony which you have heard that there was a breaking, either actual or constructive as I've explained to you; that there was an entry, that the entry was in the nighttime; that the breaking and the entering was of a dwelling; and that the breaking and entering was with the intent to commit a felony in the dwelling house. And you must find beyond a reasonable doubt that this Defendant either committed this offense or was present aiding, assisting, abetting of this in the commission of the offense.

These statutory aggravating circumstances which you are authorized to consider in this case will be submitted to you in writing. They will be set forth in the document which I've prepared and entitled "Statutory Instructions". The Statutory Instructions include the alleged statutory aggravating circumstances and the alleged statutory mitigating circumstances. And these both are on one document which are entitled "Statutory Instructions". You'll have this with you in the Juryroom when you begin your deliberations on this stage of the trial.

In the event you unanimously find beyond a reasonable doubt that one or more of the alleged statutory aggravating circumstances existed at the time the victim in this case was murdered, then you would be authorized to recommend that the death sentence be imposed on the Defendant. I will tell you also now and go into this later. That should you determine that one or more of the alleged statutory aggravating circumstances existed at the time the murder was committed and should you unanimously recommend that the sentence of death be imposed on this Defendant, then you would be required to specify in writing, in your recommendation each statutory aggravating circumstance that you found to exist beyond a reasonable doubt. So as to the alleged statutory aggravating circumstances, should you not find beyond a reasonable doubt that at least one of the alleged statutory aggravating circumstances exist at the time that the murder in this case occurred, then you would not be authorized to recommend a death sentence. And in that event, your recommendation must be life imprisonment.

Now, we've considered statutory aggravating circumstances. In addition to considering these; that is, aggravating circumstances as set forth in the Statute, you may also consider each of the alleged statutory mitigating circumstances which is supported by the evidence. A statutory mitigating circumstance is a fact of detail, an incident, or an occurrence which the General Assembly of this State has declared by Statute would render less severe; that is, mitigated the offense of murder when that mitigating fact or detail or incident or occurrence accompanies an act of murder. A statutory mitigating circumstance is one recognized by Statute as a circumstance which in fairness and mercy may be considered as extenuating or as reducing the crime of moral culpability; that is, blame or fault for the commission of the act of murder. Mitigating circumstance would not constitute either justification or excuse for the offense in question. Such a circum-

stance would simply lessen one's guilt; that is, make him less blameworthy or less culpable.

Before you can recommend the imposition of a life sentence, it's not necessary for you to find beyond a reasonable doubt the existence of an alleged statutory mitigating circumstance. While it's necessary for you to find beyond a reasonable doubt the existence of at least one alleged statutory aggravating circumstance before you can recommend that the Defendant be sentenced to death. It's not required that you find beyond a reasonable doubt the existence of at least one alleged statutory mitigating circumstance in order to recommend that the Defendant be given life imprisonment. As a matter of fact, you may recommend that the Defendant receive a life sentence regardless of whether you find the existence in the evidence of an alleged statutory mitigating circumstance or not; but where you consider an alleged statutory mitigating circumstance, it's proper for you to consider only a statutory mitigating circumstance that is supported by the evidence. So as I've explained, you may recommend a life sentence without finding the existence of an alleged statutory mitigating circumstance. Should you not unanimously find beyond a reasonable doubt of the existence in the record of at least one alleged statutory aggravating circumstance, your recommendation would be life imprisonment even though there is no proof in the record of any alleged statutory mitigating circumstance. Of course, in such an event—such an event, the recommendation that the Defendant be sentenced to life imprisonment like a recommendation that the Defendant be sentenced to death must be agreed upon by all twelve Jurors.

Now, what statutory mitigating circumstances may you properly consider in this case? What statutory mitigating circumstance does the Defendant allege are involved in this case? The attorneys have stipulated that the first one which is set forth in my instructions is that the Defendant had no significant history of prior criminal conviction involving the use of violence against another person. You may consider that.

The second which is not stipulated to which you are authorized to consider if you find supported in the record for this is that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

Now, Mr. Foreman, ladies and gentlemen, the statutory mitigating circumstances which you are authorized to consider in this case like the aggravating circumstances will be submitted to you in writing as I've explained. They are set forth on this document which I've explained to you is entitled, "Statutory Instructions" and these will be with you in the Juryroom when you deliberate. I also instruct you that in the event that you find that one or more of the alleged statutory mitigating circumstances existed in fact at the time of the murder involved in this case was committed, such a finding would not preclude you from also finding beyond a reasonable doubt the existence at the time of the murder of one or more of the alleged statutory aggravating circumstance and recommend that the Defendant be sentenced to death. In other words, the existence of an alleged statutory mitigating circumstance is not a bar to the imposition of the death penalty. However, the nonexistence of at least one alleged statutory aggravating circumstance is a bar to its imposition. You cannot recommend a death sentence unless you find beyond a reasonable doubt the existence, in fact, of at least one of the alleged statutory aggravating circumstances at the time of murder. And where after considering all of the evidence, you find beyond a reasonable doubt that at least one of the alleged statutory aggravating circumstances existed at the time the murder was committed, you may recommend that the Defendant be sentenced to death even should you also find one or more of the alleged statutory mitigating circumstances existed at the time the victim was killed. Of course, you should keep in mind that a recommendation that the Defendant be sentenced to death must be unanimous.

In considering whether to recommend that the Defendant be sentenced to death

or to life imprisonment, I charge you that you should not allow passion or prejudice or any other arbitrary fact to impose your judgment. As Jurors, you must decide the issue involved in this proceeding without bias and without prejudice as to any party. You cannot allow yourselves to be governed by sympathy, by prejudice, by passion, or by public opinion. Both the State and the Defendant have the right to expect that each of you will carefully and impartially consider all of the evidence in the case and that you will follow the law as I've given to you in determining your recommendation.

Finally, we will discuss your recommendation regarding the Defendant's punishment. The order in which I discuss with you the forms of your verdict or recommendation, please understand it's not to be considered by you in any way as an expression by me as a preference regarding which sentence the Defendant should receive. Obviously, I must discuss the recommendations in some order so the order in which I discuss the recommendation forms with you means absolutely nothing. I charge you ladies and gentlemen, that in the event you decide that the Defendant, William Gibbs Hyman, should be sentenced to life imprisonment, please use a recommendation of sentence form which reads: We the Jury, in the above entitled case, recommend to the Court that the Defendant, William Gibbs Hyman, be sentenced to life imprisonment. And Mr. Foreman, you will then please sign your name. I've written this recommendation of sentence on this sheet of paper. It has the title of the case and it's clearly marked, "Recommendation of Sentence, Count one, Murder"; and it reads as I've read to you.

With respect to any recommendation that the Defendant receive the death penalty, two things are required in our law that are not called for should you recommend a life imprisonment sentence. First, should you recommend the death penalty, you must designate in writing the statutory aggravating circumstance found by you to have existed beyond a reasonable doubt when the victim in this case was murdered. Secondly, should you recommend the imposition of a death sentence, all members of the Jury, not simply the Foreman, must sign the recommendation form. And this is as you will see when it's in the Juryroom. Again, it's a "Recommendation of Sentence" form, Count one, Murder; and the form as I've explained it. And it has space for you to define an aggravating—a statutory aggravating circumstance. These have been set forth on the "Statutory Instructions", and there is a place for all twelve Jurors to sign.

Now, along with the "Statutory Instructions", you will have both of these sentences with you in the Juryroom. Your recommendation must be one of these. Either life imprisonment or death. Regardless of what your verdict is, it must be unanimous; that is, the verdict of all twelve Jurors. The recommendation of all twelve Jurors.